John B. ALLISON, Wesley Allison, and Searle L. Allison, Appellants,

v.

HOME SAVINGS ASSOCIATION OF KANSAS CITY, Respondent.

No. WD 32743.

Missouri Court of Appeals, Western District.

Nov. 23, 1982.

H. Kent Desselle (argued), Desselle & White, Independence, for appellants.

Frank P. Sebree (argued), Shook, Hardy & Bacon, Kansas City, for respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

The Allisons appeal from a judgment of the circuit court which granted the motion of Home Savings Association of Kansas City for judgment notwithstanding the verdict on plaintiffs' claim for an alleged breach of an implied warranty of fitness owed to the Allisons as first purchasers of two houses. Home Savings appeals from the trial court's denial of its motion for a new trial on the issue of damages in its counterclaim for lost rents and profits resulting from the Allisons' failure to vacate the houses after foreclosure. We affirm the judgment with respect to the granting of judgment notwithstanding the verdict in favor of Home Savings, but reverse and remand for a redetermination of damages on the counterclaim by Home Savings.

In September, 1974 S. Wesley Allison and his wife, Searle L. Allison, purchased a new

house at 14008 Dunbar Court in the Merrywood subdivision of Grandview. In the same month, Mr. Allison and his son, John B. Allison, purchased a new house at 14011 Ballantrae Drive in the same subdivision, which has since been renamed River Oaks. Both houses were purchased from Home Savings, which furnished the financing for construction of the Merrywood development. Home Savings acquired ownership of the subdivision from the developer in May, 1974 apparently after the developer encountered financial difficulties. Construction of the two houses was completed before Home Savings acquired title to the project. After viewing the houses with a representative of Home Savings, the Allisons negotiated both loans with Home Savings and executed a promissory note secured by a deed of trust on each of the houses. The appraised value of the residence at 14008 Dunbar Court at the time of purchase, according to Home Savings, was $30,500 with a purchase price of $25,950. Purchase price of the house at 14011 Ballantrae Drive—appraised at $29,500 by Home Savings—was $23,950.

These appeals have their procedural origin in a suit filed in 1976 by the River Oaks Homes Association against the Allisons and other subdivision residents for failure to pay monthly assessments to the association. While that action was pending, the Allisons fell behind in their mortgage payments to Home Savings. The last payment made by the Allisons on the 14008 Dunbar Court residence was in December, 1977, and the last payment on the house at 14011 Ballantrae Drive was made in February, 1978. Home Savings instituted foreclosure proceedings on both houses which culminated in a trustee's sale on November 24, 1978, at which it acquired title to the houses. Home Savings notified the Allisons by letter that they were to vacate the houses on or before December 15, 1978.

Meanwhile, in August, 1978 the Allisons filed an amended answer in the action brought by the River Oaks Homes Association. In addition to stating a counterclaim against the River Oaks Homes Association, the amended answer included a third party claim against Home Savings in four counts. Counts I and II sought to prevent or set aside the foreclosure sales, and Counts III and IV sought damages for alleged breach of an implied warranty of habitability with respect to each house.

Despite being served with notice to vacate by December 15, 1978, the Allisons continued to live in both houses for several months. When they did move out in the spring of 1979, they left behind in each house certain items of personal property which were still on the premises at the time of trial. In October, 1980 Home Savings filed a counterclaim against the Allisons seeking possession of the two houses and damages of $250 per month (fair rental value) per house for willful and unlawful possession.

Before the trial began on March 3, 1981, the Allisons and the River Oaks Homes Association reached a settlement, so that River Oaks was not a participant at trial and is not involved in these appeals. The trial court accordingly realigned the parties, designating the Allisons as plaintiffs, and Home Savings as defendant. The Allisons dismissed Counts I and II of their third party claim against Home Savings, and the case then proceeded to trial on: (1) the claim of plaintiffs for damages for alleged defects in construction of the two houses, and (2) the counterclaim by Home Savings for damages for unlawful possession of the houses by plaintiffs.

John B. Allison testified that after buying the residence at 14011 Ballantrae Drive he experienced a number of difficulties with the house, including a fallen ceiling beam, frozen and broken water pipes which caused water damage to walls and carpeting, a defective front door frame, a door to an outside storage compartment which "fell apart", peeling bedroom wallpaper, a sway in the roof, water damage in the bathroom, a buckled wall in the master bedroom, and ill-fitting door frames. Allison informed Home Savings of these problems, and testified that the River Oaks project superintendent undertook certain repairs, but

made no attempt to fix any problems after "the first part of 1975". The project superintendent remembered no complaints other than the one concerning frozen pipes, and testified that damage from that condition was repaired.

Mr. and Mrs. Allison testified that the defects in their house at 14008 Dunbar Court included a patio door and kitchen window which allowed water to enter the house when it rained, leaks in the outside walls, a leak in the upstairs bathroom which damaged the dining room ceiling, doors which fell off hinges, a clothes shelf which collapsed, and a hump in the living room floor. Mr. Allison further testified to the demands he made upon Home Savings for repairs and the inadequacy of the responses.

Plaintiffs produced expert testimony from two architects who testified that the low ground on which the house at 14008 Dunbar Court was built led to improper drainage, and that the materials and methods used in construction were inferior. The sole evidence of the value of the houses in their present condition came from plaintiffs, who testified that each was worth $19,000–$20,000 at time of trial. Plaintiffs acknowledged that on the advice of counsel, they left personal property in each house after they moved.

John Cowan, vice president of Home Savings and project manager of the River Oaks subdivision, cited the continued presence of plaintiffs' personal property, including furniture, washers, dryers, food and clothing, as one of the problems preventing Home Savings from gaining possession of the properties and putting them to use. He described one of the houses as "a pigpen". Home Savings produced testimony from a home builder and project superintendent for the subdivision, who owned rental property in and near River Oaks. He estimated the fair monthly rental value of the Ballantrae Drive house at $280–$290 in 1978 and $320–$330 at time of trial. Estimated rental values for the Dunbar Court house were $300 per month in 1978 and $350–$360 at time of trial. When confronted on cross-examination with photographs of the defects

in the two houses, however, he admitted that he would not rent property in such condition.

The jury found in favor of plaintiffs on their claim for breach of implied warranties, and awarded damages of $5 with respect to the house at 14011 Ballantrae Drive and $7,000 in damages for defects in the structure at 14008 Dunbar Court. On the counterclaim of Home Savings against plaintiffs for unlawful possession, the jury returned a verdict in favor of Home Savings and awarded damages of $4 with respect to the house at 14011 Ballantrae Drive and $500 for the residence at 14008 Dunbar Court.

The trial court subsequently granted the motion of Home Savings for judgment notwithstanding the verdict, set aside the jury's award of damages to plaintiffs and entered judgment for Home Savings on the claimed breach of implied warranties. The trial court also denied the motion filed by Home Savings for a new trial on the issue of damages on its counterclaim against plaintiffs.

### The Allisons' appeal

In their appeal from the judgment notwithstanding the verdict, the Allisons contend that the trial court erred because: (1) Home Savings, as the vendor of the properties, breached an implied warranty of fitness owed to the plaintiffs as first purchasers, and (2) Home Savings' extensive participation in the project as a lender created a duty to purchasers to exercise reasonable care in preventing defective construction by the builder.

In a departure from the harsh doctrine of caveat emptor, our Supreme Court held in *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795, 799 (Mo.1972) (en banc), that on the basis of an implied warranty of habitability or quality, the original purchaser of a new home can recover from a builder-vendor for losses or damages resulting from latent defects in construction:

[T]he purchase of a residence is in most cases the purchase of a manufactured product—the house. The land involved is

seldom the prime element in such a purchase, certainly not in the urban areas of the state. *The structural quality of a house, by its very nature, is nearly impossible to determine by inspection after the house is built, since many of the most important elements of its construction are hidden from view.* The ordinary "consumer" can determine little about the soundness of the construction but must rely upon the fact that the vendor-builder holds the structure out to the public as fit for use as a residence, and of being of reasonable quality (emphasis added).

■ Missouri courts have thus placed themselves in agreement with courts of a substantial number of states which recognize that a builder-vendor of new housing may be held liable for structural defects under a theory of implied warranty. *See Sims v. Lewis,* 374 So.2d 298 (Ala.1979); *Pollard v. Saxe & Yolles Dev. Co.,* 12 Cal.3d 374, 115 Cal.Rptr. 648, 525 P.2d 88 (1974) (en banc); *Petersen v. Hubschman Constr. Co.,* 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d 1154 (1979); *McDonald v. Mianecki,* 79 N.J. 275, 398 A.2d 1283 (1979); *Yepsen v. Burgess,* 269 Or. 635, 525 P.2d 1019 (1974) (en banc); Annot., 25 A.L.R.3d 383 (1969). In order to recover for breach of implied warranty of habitability in Missouri, negligence, knowledge or fault on the part of the builder-vendor need not be shown. *Smith v. Old Warson, supra,* at 798; *Matulunas v. Baker,* 569 S.W.2d 791, 794 (Mo.App.1978).

■ Nevertheless, the trial court granted Home Savings' motion for judgment notwithstanding the verdict primarily because although *Old Warson* imposed liability for builder-vendors,[1] the defendant here was not the builder. *Old Warson* specifically states at 801 that the abandonment of caveat emptor can be applied only to those who

have the opportunity to observe and correct construction defects:

[T]he rationale for allowing recovery by a purchaser of a new house, on a theory of breach of an implied warranty of habitability or quality, is applicable only against that person who not only had an opportunity to observe but failed to correct a structural defect, which, in turn, became latent, i.e., the builder-vendor.

■ The Allisons argue that Home Savings falls within the rule of *Old Warson* because it had an opportunity to observe and inspect each stage of the construction of the houses.

The record does not indicate that. No evidence whatsoever was offered to show Home Savings' involvement in the pre-construction phase of the project other than financing. We have no facts supporting either opportunity to observe or actual knowledge of construction defects. We have only the assertion of plaintiffs' attorney, both before the court and in his brief, that Home Savings should have known of the possibility of defective construction. That is not enough.

We therefore uphold the trial court's determination that Home Savings could not be held liable for damages on the theory of breach of an implied warranty of habitability.

■ In their second point, plaintiffs assert that Home Savings, as a lender, owed a duty to purchasers to detect and warn of defects in construction. This duty arose, plaintiffs argue, because Home Savings' "extensive involvement" in the construction project either made Home Savings aware or should have made Home Savings aware of the possibility that the financially-troubled builder would cut corners in construction materials and methods.

*Old Warson, supra,* stated at 801 that "[w]hether or not such latent defects resulted from the sole activities of the builder-vendor or that of an independent contractor used by him would be immaterial ...." *See also Tassan v. United Dev. Co.,* 88 Ill.App.3d 581, 43 Ill.Dec. 769, 775, 410 N.E.2d 902, 908 (1980); *Bolkum v. Staab,* 133 Vt. 467, 346 A.2d 210, 211 (1975).

1. Of course a defendant need not personally perform the actual construction in order to be held liable. A developer who causes houses to be built for the purpose of sale to the public will be held to be a builder-vendor, since purchasers from a developer-vendor depend on his ability to hire a general contractor capable of constructing a sound residence. The court in

As reflected in the pleadings, presentation of evidence, and instructions to the jury, plaintiffs tried their case solely on the theory of breach of a vendor's implied warranty of habitability. In raising the argument contained in their second point for the first time on appeal, plaintiffs have run afoul of the sound principle that an appellate court will review a case only upon the theory advanced at trial. *Jenni v. Gamel,* 602 S.W.2d 696, 699 (Mo.App.1980). Hence, the question of Home Savings' liability on the basis of the alleged duty owed to plaintiffs is not properly preserved for our determination. *Moore v. Riley,* 487 S.W.2d 555, 558–59 (Mo.1972).

■ Even if the issue were properly preserved for review, the record simply does not support the existence of a duty such as that which plaintiffs seek to impose. Plaintiffs rely on *Connor v. Great Western Sav. and Loan Ass'n,* 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968) (en banc), in which the defendant-lending institution was held to owe a duty, as a lender, to purchasers of new houses to exercise reasonable care to see that the houses were constructed free of defects.

*Connor* involved a development scheme in which Great Western financed the original purchase of the tract and held title to it until the developer was ready to use the land, at which time he purchased it at a substantial profit to Great Western. In addition, Great Western required the developer to submit plans and specifications, suggested selling prices, held a right of first refusal to supply mortgage loans to purchasers, received loan fees from the developer for every purchaser obtaining financing, and was entitled to receive fees and interest from the developer if a purchaser obtained financing elsewhere.

Considering these facts, the California Supreme Court held at 616 that the defendant was liable for its own negligence:

In undertaking these relationships [with the developer], *Great Western be-*

*came much more than a lender* content to lend money at interest on the security of real property. *It became an active participant* in a home construction enterprise.... Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender (emphasis added).

Here, the record shows only that Home Savings financed the construction of the subdivision, acquired title to the two properties after their construction, and later sold them. That does not constitute involvement in the development and construction phases such as would justify a result similar to that in *Connor.* Moreover, subsequent cases in California and other jurisdictions have declined to impose liability on construction lenders whose activities do not clearly exceed those of a normal lender. *See Meyers v. Guarantee Sav. & Loan Ass'n,* 79 Cal.App.3d 307, 144 Cal.Rptr. 616, 620 (1978); *Armetta v. Clevetrust Realty Investors,* 359 So.2d 540, 543 (Fla.App.1978). More importantly, the legislative response to *Connor* has been the passage of statutes limiting the liability of a construction lender to cases involving misrepresentation or activities outside the scope of a lender.[2] Missouri is no exception. Section 369.264[3] provides as follows:

An association which makes a loan, the proceeds of which are used or may be used by the borrower to finance the design, manufacture, construction, repair, modification or improvement of real or personal property for sale or lease to others, shall not be held liable to the borrower or to third persons for any loss or damage occasioned by any defect ... or for any loss or damage resulting from the failure of the borrower to use due care ... unless the association has knowingly been a party to misrepresentations with respect to such real or personal property.

Under the statute, we find no basis for imposing liability on a lender predicated upon a duty to prevent the construction and

2. *See* Cal.Civ.Code § 3434 (West 1970).

3. All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

sale of defective new houses to third parties, absent evidence of knowing misrepresentation.

The trial court properly granted the motion of Home Savings for judgment notwithstanding the verdict and set aside the jury award of damages to plaintiffs. That portion of the judgment in favor of Home Savings is affirmed.

### Home Savings' appeal

On appeal from that portion of the judgment overruling its motion for new trial on the issues of damages awarded on its counterclaim against plaintiffs, Home Savings raises two points of error: (1) the trial court improperly allowed counsel for plaintiffs, over the objection of Home Savings, to argue to the jury that Home Savings had possession of the two houses prior to trial; and (2) the amount of damages awarded by the jury were so inadequate as to indicate passion, bias, prejudice or partiality.

At trial, Home Savings took the position that because plaintiffs left personal property in the houses, they did not relinquish their unlawful possession through the time of trial. The trial judge determined as a matter of law that Home Savings was entitled to possession of the houses and instructed the jury in Instructions 15 and 17, that it must find in favor of Home Savings on its claim against plaintiffs and award such sum as would fairly and justly compensate Home Savings for the loss of rents and profits from December 15, 1978, to the date of the verdict.

In his final comments to the jury, counsel for plaintiffs argued as follows:

MR. DESSELLE: "Now, let's go back to this. They're saying, 'Well, they had some stuff in there, and we don't know whether we can take possession or not. Somebody said we could, and then on advice of counsel we didn't.'

But they went in there. If they had a right to go in, they had a right to do anything they wanted to in there. They could have cleaned it up, fixed it up and rented it out. They didn't do it.

MR. SEBREE: I object to that argument. The Court instructed that they had possession until that period of time. I think that trespasses on the instruction that the Court has given.

THE COURT: In view of the fact that this is closing argument, I think that's a legitimate remark. The objection will be overruled."

Home Savings contends that plaintiffs' argument warrants reversal because it was contrary to the instructions of the court. We agree.

■ The trial court is required to prohibit or promptly correct misstatements of the law which occur in closing argument. *White v. Gallion*, 532 S.W.2d 769, 771 (Mo. App.1975). Where the misstatement is contrary to the law as submitted in the court's instructions, and the court permits the misstatement by overruling an objection to it, "reversible error is almost inevitable." *Halford v. Yandell*, 558 S.W.2d 400, 412 (Mo.App.1977); also, *Hill v. Barton*, 579 S.W.2d 121, 126–27 (Mo.App.1979). As we stated in *Carrel v. Wilkerson*, 507 S.W.2d 82, 85 (Mo.App.1974):

The permissible field of jury argument is ·broad, but the law does not contemplate that counsel may go beyond the issues or record and urge ... a theory of claim or defense which ... conflicts with the trial court's instructions submitting the issues of the case.

Further, when counsel misstates the law in argument, the trial court's ruling is not a matter of discretion. The rationale for this uncompromising stance is that:

[t]he jury's task is difficult enough ... without permitting counsel to inject confusion in the case by misstatements of law. The whole salutary purpose of the rule would be thwarted if it could be avoided on the ground that the argument was correct and the instruction wrong on the law. Strictly speaking, arguments on the law should be to the instructions which declare the law in the case, and certainly, argument contrary to the instructions cannot be permitted, or jury trials will become uncontrolled chaos.

**854**

*Busch & Latta Printing Corp. v. State Highway Comm'n,* 597 S.W.2d 189, 201 (Mo. App.1980).

The foregoing principles do not, of course, prevent a party from challenging the correctness of the instructions given by the trial court. (Plaintiffs here have not done so.) Their purpose is to prevent the confusion and misdirection which would inevitably result should counsel be allowed to embark upon a course of argument which is at odds with the law contained in the instructions.

■ Defendant's objection to plaintiffs' argument should have been sustained and the jury instructed to disregard the argument.[4] Because the trial court's failure to do so constitutes sufficient grounds for reversal, a discussion of Home Savings' remaining claim of error, the alleged inadequacy of the damage award, is unnecessary.

For the foregoing reasons, we affirm the judgment notwithstanding the verdict in favor of Home Savings, but reverse and remand for a new trial on the issue of damages on the counterclaim by Home Savings.

All concur.

---

**4.** Moreover, the inordinately small amount of the jury's award to Home Savings on its counterclaim, leads one to the conclusion that the jury may very well have been misled by plaintiffs' counsel's argument and the court's overruling of defendant's objection. The ruling that counsel's remarks were "legitimate" could easily have confused the jurors and have led them to believe that it was up to them to decide for what periods of time plaintiffs were to be as-sessed damages for defendant's loss of rents and profits. Of course, under the instructions the jury's mission was only to decide the fair rental value of the two houses for the period between December 15, 1978, and the time of trial, March 3, 1981. The only evidence on that question was considerably in excess of the $250 per month for each house sought in defendant's counterclaim.