**POINT EAST CONDOMINIUM OWNERS' ASSOCIATION, INC., Appellant,**

**v.**

**CEDAR HOUSE ASSOCIATES COMPANY et al., Appellees.**

[Cite as *Point East Condominium Owners' Assn. v. Cedar House Assoc.* (1995), 104 Ohio App.3d 704.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 67408.

Decided June 19, 1995.

706

*Ulmer & Berne, Marvin L. Karp, Thomas L. Rosenberg* and *Thomas R. Kelly,* for appellant.

*Gallagher, Sharp, Fulton & Norman, James S. Gowan* and *Thomas D. Robenalt,* for appellees Cedar House Assoc. & Davis Development Group.

*Thompson, Hine & Flory, Stephen F. Gladstone* and *Patrick F. Haggerty,* for appellees E.B. Katz Plumbing Co. & E.B. Katz Co.

JAMES M. PORTER, Judge.

Plaintiff-appellant, Point East Condominium Owners' Association, Inc. ("Point East"), appeals from the trial court's granting of summary judgment in favor of defendants-appellees Cedar House Associates Company ("Cedar House"), Davis Development Group (a.k.a. "Davis Construction"), and E.B. Katz Plumbing Company ("Katz"). Plaintiff's claims arose out of the 1986–1987 damage resulting from leaking sprinkler systems in the common ceiling areas of the Point East Condominium. For the reasons hereinafter stated, we find merit to the appeal, reverse and remand for further proceedings.

Cedar House was an Ohio corporation formed by Larry Davis, Norman Adler and Arnold King, who acted as partners in 1977 to develop the Point East Condominium project at 27500 Cedar Road in Beachwood, Ohio. The three partners transferred the underlying real estate to Cedar House to develop the project. Davis was the chief executive officer of Davis Construction, which became the general contractor on the project. Construction began in 1977 and ultimately resulted in the erection of a ten-story building consisting of a two-floor penthouse containing eight individual penthouse condominium units, and eight floors containing eighty-six individual condominium units with various common areas. Katz was the subcontractor to Davis Construction that installed the fire suppression sprinkler system at issue in the case.

Cedar House contracted with Davis Construction to construct the condominium buildings. Because of the partner relationship among the principals ("it was a mom and pop kind of thing"), no formal written contract was ever signed. However, a Project Manual was issued by Cedar House to the general contractor, Davis Construction, and the subcontractors, which set forth the relationships between the parties and the specifications and requirements for construction. The Project Manual also contains standard AIA Document A201, General Condi-

tions of the Contract for Construction, typically used in construction projects. The parties treated the Project Manual as though it were the general contract specifying the obligations between and among the respective parties, including the subcontractors, which performed under Davis Construction's full-time project manager. Project Manual provisions relevant to the issues in this case will be discussed more fully where appropriate throughout this opinion.

Davis Construction entered into a formal purchase order subcontract for $300,000 with Katz, dated November 21, 1978, to install the fire suppression sprinkler system. The purchase order contained the following provision:

"You [Katz] are to assume as to your work, the same responsibility toward the owner as our general contract imposes upon us. This relationship and similarity of obligation shall also include terms of payment, cleaning up and disposal of waste material."

Although the purchase orders to subcontractors and suppliers were issued in the name of Davis Construction, all primary decisions as to the wording of the subcontracts and as to issues arising on the job site were made jointly by "all three partners," Davis, Adler and King. Among the decisions made by the partners was the decision to change the original specifications for the fire suppression sprinkler system from black steel piping to copper piping.

The first phase of construction involving the construction of the shell of the building was completed in 1978. In December 1979, Cedar House filed its Declaration of Condominium Ownership, pursuant to R.C. 5311.08, thereby creating the Point East Condominium Owners' Association. However, from 1979 through September 30, 1985, defendants Cedar House and Davis Construction maintained control of the board of managers of the association by appointing four of the six members of that board pursuant to Ohio's condominium laws. During that six-year period, the board consisted of Davis, Adler, King and their family members. During this period, Cedar House engaged DAK Management Company to manage the property until the association came into existence. DAK stood for *D*avis, *A*dler and *K*ing, who were the partners.

Once construction of the shell was completed in 1978, Cedar House began selling individual condominium suites ("units") to private owners under written contracts entitled "Point East Condominium Sales—Purchase Agreement." Each such purchase agreement provided that Cedar House would undertake to construct and finish the individual owner's suites according to designs and layouts provided by the purchaser. A portion of the "finishing" construction included the extension of the sprinkler system lines from the main system to the ceiling areas above the individual suites. Consequently, as new suites were sold and custom finished, Katz would extend the sprinkler system piping to the new units. Katz's installation work began in October 1978 and the entire system to all suites was

not completed until January 13, 1988. Each purchase agreement in Section 26 also contained a limited warranty covering defects in material and workmanship for two years in the common areas and for twelve months in the units. These warranties were required by R.C. 5311.25(E).

In October 1980, leaks developed in several sprinkler heads in portions of the common area sprinkler system. Grunau, the sprinkler head manufacturer, retained a metallurgist, Marvin Evans, to investigate the cause of the leaks. By a letter report dated December 1, 1980, Evans found that the valve seats on the sprinkler heads leaked because of corrosion and that "the most probable source of this corrosion is the residual soldering flux used to join the copper piping of the system." There is no evidence that the board of managers, then controlled by Cedar House and Davis Construction, ever received a copy of this letter in 1980 or 1981. After this investigation, defendants concurred that the 1980 leaks were caused by corrosion in the sprinkler heads. The sprinkler heads in the affected areas were replaced. It was thought at the time that any leaking problems with the sprinkler system had been corrected.

Subsequently, in 1987, "a systemic pattern of leaks" developed in the horizontal piping that had been installed subsequent to 1980 in common area ceilings above the individual units. Plaintiff was notified of these leaks by Cedar House on October 15, 1987, when Norman Adler delivered a letter to plaintiff's board of managers advising the board of the conditions. In that letter, Adler informed plaintiff that engineering reports received by defendants had "indicated corrosion in the pipe due to foreign particles resting on the inside of the surface of the pipe," and that defendants "cannot discount the possibility that there may be continuing corrosion in the pipe which may cause some additional leakages."

Plaintiff commenced this action on September 30, 1988 [1] against defendants Cedar House, Davis Construction and Katz for breach of contract, breach of express and implied warranty and negligence. It was claimed that the defective sprinkler system caused damage to plaintiff's property, diminished the value of the condominium and required expenses to repair or avoid the losses resulting from further leaking. Plaintiff, Point East Condominium Owners' Association, claims standing to bring the action pursuant to R.C. 5311.20, which authorizes a condominium owners' association to sue on behalf of all unit owners with respect to matters relating to the common areas. The sprinkler system piping above each suite is deemed to be in a "common area." R.C. 5311.01(B).

---

1. The action was initially filed in 1988 as C.P. No. 157450. It was voluntarily dismissed on March 21, 1990 and refiled on March 19, 1991 as C.P. No. 207548. Claims against the architect and engineers on the project have been voluntarily dismissed by plaintiff.

In August 1993, the defendants filed motions for summary judgment. Plaintiff opposed the motions. The parties submitted detailed briefs and included the Project Manual, voluminous exhibits and deposition excerpts in support of their respective positions, which shall be referenced herein.

Cedar House and Davis Construction argued (1) that the statute of limitations started to run in 1980 when the original leaks occurred in the main system sprinkler heads, and that plaintiff's claims were barred by the four-year negligence statute of limitations set forth in R.C. 2305.09(D); (2) that any express warranties by Cedar House had long since expired by 1988; (3) that Cedar House and Davis did not "participate in the means and methods" of the installation of the sprinkler system installed by Katz and therefore could not be liable for the negligence of their subcontractor; (4) that no valid express warranties were made; and (5) that no implied warranty of workmanlike construction and reasonable care in selection of materials could be imposed upon them.

Katz argued (1) that plaintiff's negligence claims were time barred by R.C. 2305.09(D); (2) that plaintiff was not in privity of contract with Katz and therefore could not maintain an action against Katz for economic loss arising from defective workmanship; (3) that Katz gave no express warranties; and (4) that no implied warranties of good workmanship were imposed upon Katz because plaintiff was not a third-party beneficiary of the Davis Construction/Katz purchase order.

On May 12, 1994, the trial court entered summary judgment in favor of the defendants without explanation, opinion or identification of the grounds upon which summary judgment rested. Plaintiff's timely appeal ensued.

## STANDARDS FOR SUMMARY JUDGMENT

Under Civ.R. 56, summary judgment is proper when:

"(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

It is well settled that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265, 278; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802.

Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

However, the nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099; *Celotex, supra,* at 322–323, 106 S.Ct. at 2552–2553, 91 L.Ed.2d at 273–274. In accordance with Civ.R. 56(E), "a nonmovant may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial." *Chaney v. Clark Cty. Agricultural Soc.* (1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513, 515.

"This court reviews the lower court's granting of summary judgment *de novo.*" *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265, 271; *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157 ("[W]e review the judgment independently and without deference to the trial court's determination.").

In resolving the issues presented by this appeal, we are mindful that " '[t]he construction of written contracts and instruments of conveyance is a matter of law.' " *Latina v. Woodpath Development Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262, 264. Our goal is to arrive at the intent of the parties, which is presumed to be stated in the contract documents. As recently held in *The Toledo Group, Inc. v. Benton Industries, Inc.* (1993), 87 Ohio App.3d 798, 805, 623 N.E.2d 205, 209–210:

"The interpretation of a written contract is a matter of law for the court. *Alexander v. Buckeye Pipeline [Pipe Line] Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. The purpose of contract construction is to effectuate the intent of the parties. *Skivolocki v. East Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. The intent of the parties is presumed to reside in the language they chose to employ in the agreement. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Common words appearing in the instrument will be given their plain and ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall contents of the contract. *Alexander, supra,* at paragraph two of the syllabus."

Although no written agreement signed by the parties to the construction project (Cedar House and Davis Construction) was actually found, the one-inch-thick Project Manual served, in large part, the purpose of the contract between the owner and the general contractor. It was for all intents and purposes a contract implied in fact. See *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6–7, 540

N.E.2d 257, 263 ("'In contract implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which made it inferable that the contract exists as a matter of tacit understanding.'"). Therefore, we will treat the Project Manual as the parties did—as the written part of their contract for the construction of Point East.

Plaintiff's first assignment of error states as follows:

"I. The trial court erred in granting summary judgment to defendants Cedar House and Davis Construction."

■■■ All of the defendants argue that plaintiff's negligence claims were barred by the four-year statute of limitations governing tort actions for damage to real property (R.C. 2305.09[D] ). Plaintiff concedes that its tort claims are governed by the four-year statute of limitations, but argues that the leaks in the sprinkler system piping, which form the basis for this action, did not occur until 1987; that the statute does not begin to run until actual damage occurs; that plaintiff had no knowledge of this problem until October 1987, approximately one year prior to the filing of this lawsuit; and the fact that leaking sprinkler heads were replaced in 1980 did not put it on notice that the horizontal sprinkler piping not yet installed to serve the individual units would suffer from the same condition.

■■■ Our recent decision in *Gardens of Bay Landing Condominiums v. Flair Builders, Inc.* (1994), 96 Ohio App.3d 353, 358, 645 N.E.2d 82, 85, summarizes the applicable law as follows:

"An action for the failure of a builder to perform in a workmanlike manner is a tort sounding in negligence and is governed by the four-year statute of limitations found in R.C. 2305.09. *Benson v. Dorger* (1972), 33 Ohio App.2d 110, 115, 62 O.O.2d 176, 179, 292 N.E.2d 919, 922. Unless damage is immediate, the cause of action does not accrue until actual injury occurs or damage ensues. *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147, paragraph two of the syllabus. The judiciary will determine when a cause of action arose for purposes of statutes of limitations unless the triggering event is defined by the legislature. *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 4 OBR 335, 447 N.E.2d 727, paragraph one of the syllabus.

"In *Cincinnati Ins. Co. v. Alcorn* (1993), 91 Ohio App.3d 165, 631 N.E.2d 1125, a homeowner's marble tile floor was installed in December 1984, and began cracking soon after. The subcontractor, Alcorn, attempted to remedy the problem in early 1985 but the tiles continued to crack. The tiles were removed in 1990 and it was discovered the underlayment had been improperly installed. The court found no actual damage occurred until the tiles were removed and the defective underlayment discovered."

In *Flair*, damaged cement was first discovered in 1985 and two identical instances were discovered in 1986. It was not until 1990, when further episodes occurred, that appellant hired engineers, who advised that all the floors needed replacing. This court stated:

"As in *Alcorn, supra,* appellant discovered and replaced the defective underlayment in 1985. The same problem was experienced in two other buildings the following year. At that point, appellant should have known there was a widespread problem with the underlayment. Appellant did not retain the engineers for nearly four years after the third instance of failure.

"Appellant knew it had been damaged after the third instance occurred on October 15, 1986. The four-year statute of limitations began to run at that point. Appellant did not file suit until May 9, 1991, and, therefore, suit was barred by the statute of limitations." *Id.* at 359, 645 N.E.2d at 86.

 We find that the instant case is governed by the result in *Alcorn* rather than *Flair*. This is evident from the analysis of the *Alcorn* court, 91 Ohio App.3d at 170–171, 631 N.E.2d at 1128:

"We turn now to the question of when the cause of action accrued. In *Velotta, supra,* 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147, at paragraph two of the syllabus, the Supreme Court held that '[w]hen negligence does not immediately result in damages, a cause of action for damages arising from negligent construction does not accrue until actual injury or damage ensues.'

" 'The *Velotta* holding is not a "discovery rule." The construction cases deal with delayed occurrence of damages, not with the "discovery" of injury. The *Velotta* decision is concerned solely with accrual of a cause of action for purposes of a statute of limitations, not with discovery of injury or damages which have already occurred.' *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 198, 551 N.E.2d 938, 943.

"We find that no actual damage resulted from Alcorn's negligence until Spectrum and Kennedy were required to remove the floor in November 1990 to find out whether the underlayment was properly installed. See *Wisecup v. Gulf Dev.* (1989), 56 Ohio App.3d 162, 164–165, 565 N.E.2d 865, 867–869; *Elliott v. Fosdick & Hilmer, Inc.* (1983), 9 Ohio App.3d 309, 310–312, 9 OBR 575, 576–579, 460 N.E.2d 257, 259–262; *Zink [v. Harp ], supra,* at 4–6 [1991 WL 214982]. The cracking of the tiles in and of itself was evidence of poor workmanship, but there was no damage until the floor actually had to be removed. See *Saylor v. Hageman* (Dec. 19, 1988), Clermont App. No. CA88–01–006, unreported, at 3–4, 1988 WL 135245. Since statutes of limitations 'are limitations upon the rights of the citizens of Ohio for redress, cases in which the application of a statute of limitations is doubtful should be resolved in favor of permitting the case to be

decided upon its merits.' *Wisecup, supra*, 56 Ohio App.3d at 165, 565 N.E.2d at 868–869.

"Accordingly, since a four-year statute of limitations applies, and the cause of action accrued in November 1990, appellants had until November 1994 in which to file suit. Their complaint was filed well before that time. Therefore, the trial court erred in concluding that their suit was barred by the statute of limitations and in granting summary judgment in favor of Alcorn. Appellants' sole assignment of error is sustained."

In the instant case, the defendants knew from the Evans report that excessive flux had been the cause of the leaks in the sprinkler heads that were replaced in 1980. At that point, they believed that the problem had been cured by the installation of replacement sprinkler heads. As it turns out, expert opinion in the record before us supports the conclusion that excessive flux was also the cause of the pitting corrosion in the horizontal piping subsequently installed above the units after 1980. However, these were latent defects which did not manifest themselves until actual damage occurred to the later-installed piping in 1987. Even if it is assumed, *arguendo*, that plaintiff had knowledge of the Evans report, the plaintiff was not bound to anticipate in 1980 that the defendants would continue to employ unworkmanlike methods (excessive flux in soldering the new piping). Indeed, plaintiff had no cause of action in 1980 for piping not yet installed or actual injury not yet incurred, especially since it was assumed that the problem had been corrected.

Under the peculiar circumstances of this case, we find that the four-year statute of limitations did not commence to run until the leaks caused actual damage in 1987, and plaintiff's tort claims are not barred by R.C. 2305.09(D).

Cedar House and Davis Construction also argue that they did not participate in the means and methods employed by Katz in installing the sprinkler system and cannot be liable in tort for Katz's workmanship. In short, they claim they were not subject to any implied duty of good workmanship because an independent subcontractor performed the work.

In *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 36 O.O.2d 52, 218 N.E.2d 594, the Ohio Supreme Court held as follows, at paragraph three of the syllabus:

"A duty is imposed by law upon a builder-vendor of a real-property structure to construct the same in a workmanlike manner and to employ such care and skill in the choice of materials and work as will be commensurate with the gravity of the risk involved in protecting the structure against faults and hazards, including those inherent in its site. If the violation of that duty proximately causes a defect hidden from revelation by an inspection reasonably available to the vendee, the vendor is answerable to the vendee for the resulting damages."

■ Cedar House takes the position that it was not subject to any such duty because it was not the "builder" of the project since it "hired" Davis Construction to do the actual construction and Davis Construction hired subcontractor Katz to do the sprinkler work. Davis Construction, for its part, argues that it was not in privity with plaintiff and therefore was not the "vendor" and was not responsible for Katz's workmanship. We do not find these arguments persuasive. We find that both the developer/vendor (Cedar House) and the builder (Davis Construction) were bound by an implied warranty of good workmanship. The thrust of *Mitchem* can not be frustrated by simply separating the role of vendor from builder.

Several jurisdictions have considered the question of whether a developer/vendor, like Cedar House, is subject to the same duty to complete the work in a workmanlike manner as a "builder/vendor." In *Allison v. Home Savings Assn. of Kansas City* (Mo.App.1982), 643 S.W.2d 847, the Missouri Court of Appeals held that a developer who had sold properties, but had hired a general contractor to build the structures thereon, was subject to liability for unworkmanlike construction:

"Of course, a defendant need not personally perform the actual construction in order to be held liable. A developer who causes houses to be built for the purpose of sale to the public will be held to be a builder-vendor, since purchasers from a developer-vendor depend on his ability to hire a general contractor capable of constructing a sound residence. The court in [*Smith v.*] *Old Warson* [*Development Co.* ], *supra,* stated [479 S.W.2d 795] at 801 that 'whether or not such latent defects resulted from the sole activities of the builder-vendor or that of an independent contractor used by him would be immaterial.'" *Id.* at 851, fn. 1.

The Maryland Court of Appeals issued a similar holding in *Council of Co– Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.* (1986), 308 Md. 18, 517 A.2d 336. In that case, the question presented was whether the developer of a condominium complex could be held liable for injuries occurring as a result of defects in the construction of the condominiums. The Maryland court concluded that:

"The developer is, in a sense, the builder of the project, even though he may delegate to others the physical acts of construction. Given the current trend of expanding the exceptions to the rule of nonliability of one who has employed an independent contractor, and given the policy considerations favoring the imposition of at least initial liability upon the person who sits at the top of the pyramid of those who create the improvement, a strong argument may be advanced in favor of the recognition of a nondelegable duty on the part of the developer * * *." 308 Md. at 39, 517 A.2d at 347.

The rationale for holding the developer responsible was also stated in *Tassan v. United Dev. Co.* (1980), 88 Ill.App.3d 581, 43 Ill.Dec. 769, 410 N.E.2d 902, where the developer/seller was held subject to the same implied duties as a builder-seller:

"Purchasers from a builder-seller depend on his ability to construct and sell a home of sound structure. Purchasers from a developer-seller depend on his ability to hire a contractor capable of building a home of sound structure. The buyers here had no control over United's choice of a builder. United stood in the best position to know which contractor could perform the work adequately. The dependent relationship here between the buyers and United is the same as if United was a builder-seller. Necessarily, we hold that United could be deemed to have made an implied warranty * * *." 88 Ill.App.3d at 587, 43 Ill.Dec. at 775, 410 N.E.2d at 908.

We find the reasoning of these cases persuasive. Similarly, in the instant case, Cedar House obtained the property and financing, prepared the plans and specifications and retained the general contractor; its officers were intimately involved in the direction and progress of the on-site construction activities and managed the property through DAK; and construction orders were issued by both Norman Adler (principal of Cedar House) and Larry Davis (CEO of the construction company).

This court has previously held that a developer of a condominium project is liable for construction defects, notwithstanding the fact a general contractor was hired to perform the construction work. In *Fairmount Richmond Condominium Assn. v. Multiplex, Inc.* (Jan. 24, 1985), Cuyahoga App. No. 48076, unreported, 1985 WL 7457, this court considered a case where a condominium owners' association sued the partnership (25805 Fairmount Company) that had sold the individual units to the condominium owners and the general contractor (Multiplex) for defects in roofs which had been installed by a subcontractor (Warren Roofing & Insulation Co.). In affirming the trial court's judgment against the seller (25805 Fairmount Company) this court pointed out that "[t]he Partnership planned and designed the building, not Multiplex. Moreover, the trial court premised the Partnership's liability on the transfer of the defective roofs to the Association." *Id.* at 3–4. In this case, similarly, the developer/vendor, Cedar House, planned and designed the condominium and conveyed the defective sprinkler pipes to plaintiff as part of the common areas conveyed upon sale.

In the leading case of *McMillan v. Brune–Harpenau–Torbeck Builders, Inc.* (1983), 8 Ohio St.3d 3, 8 OBR 73, 455 N.E.2d 1276, the Ohio Supreme Court made the following public policy pronouncement in the course of holding that the duty to construct in a workmanlike manner extends to subsequent vendees not in privity with the builder-vendor:

"Improved workmanship and accountability are promoted by an expansion of the scope of the duty as well. Were privity to be maintained as a necessary element for suits against vendors, it is conceivable that 'strawman' vendees would be utilized by vendors to escape potential liability." *Id.* at 5, 8 OBR at 75, 455 N.E.2d at 1278.

If Cedar House's argument had merit, a developer could avoid the duty imposed under *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 36 O.O.2d 52, 218 N.E.2d 594, by the simple expedient of delegating all of the work to contractors and subcontractors who are not in privity with the ultimate purchasers. Such a result would be contrary to the public policy announced in *Mitchem* and *McMillan*. We reject the argument that Cedar House had no duty to exercise due care toward the plaintiff in the choice of materials and workmanship.

Davis Construction argues that it was not the "vendor" of the condominium units, was not in privity of contract with plaintiff, and therefore, could not be held to any implied warranties imposed by law upon a "builder/vendor." In any event, it contends it delegated the sprinkler system installation to its subcontractor and could not be responsible for any negligent workmanship. We do not find that these arguments excuse the general contractor, Davis Construction.

In *McMillan*, the Supreme Court held in the syllabus: "Privity of contract is not a necessary element of an action in negligence brought by a vendee of real property against the builder-vendor." The court stated as follows:

"The extension of the duty of care in the real property context follows the trend of strong legal precedent in the area of products liability. In *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227 [35 O.O.2d 404, 218 N.E.2d 185], this court ruled, *inter alia*, that privity of contract is not necessary for a successful products liability action in tort. Notwithstanding claims to the contrary, privity of contract is no more valid a requirement in the context of real property than it is in the area of consumer products. Each may have defects undetectable even after reasonable investigation by the buyer. In either context, *caveat emptor* must give way to the negligence standard of liability." *McMillan*, 8 Ohio St.3d at 5, 8 OBR at 75, 455 N.E.2d at 1278.

This principle was likewise applied by this court in *Fugo v. White Oak Condominium Assn., Inc.* (Aug. 19, 1993), Cuyahoga App. No. 63440, unreported, 1993 WL 317445, where we reversed a summary judgment in favor of the builder, Bee Gee Enterprises, Inc., with respect to the plaintiff Condominium Association's claim of breach of an implied warranty of performance in a workmanlike manner in the new construction of condominium units, and stated:

"We agree [with plaintiff-appellant] that a genuine issue of material fact exists whether defendant-builder breached the implied warranty of construction in a workmanlike manner." *Id.* at 5.

Bee Gee Enterprises, Inc., like Davis Construction herein, was not the seller, but only the builder. The seller was White Oak Condominium Assn., Inc. White Oak was formed by several persons, including the principals of Bee Gee Enterprises, Inc., solely for the purpose of holding and "developing" the land and selling the condominium units to the individual purchasers, similar to the facts of this case.

■ Davis Construction also argues it had no responsibility for the workmanship of its subcontractor Katz. However, the Project Manual, which contained standard AIA General Conditions, demonstrates that Davis Construction was responsible for supervising and directing the work. Section 4.3.1 of the Project Manual states:

"The contractor shall supervise and direct the Work, using his best skill and attention. He shall be solely responsible for all of the construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the Work under the Contract."

Section 4.3.2 of the Project Manual also provides:

"The contractor shall be responsible to the Owner for the acts and omissions of his employees, subcontractors and their agents and employees, and other persons performing any of the Work under a Contract with the contractor."

■ These provisions bound Davis Construction to exercise sole responsibility for the means, methods, techniques and procedures of construction, including those attendant to the installation of the fire sprinkler system. "The ultimate question is not whether the employer actually exercises such control, but whether he has the right to control * * *." *Indus. Comm. v. Laird* (1933), 126 Ohio St. 617, 619, 186 N.E. 718, 719; *Marisay v. Perrysburg Machine & Tool* (1987), 37 Ohio App.3d 35, 37, 523 N.E.2d 329, 331; *Prime Kosher Foods v. Bur. of Emp. Serv.* (1987), 35 Ohio App.3d 121, 123, 519 N.E.2d 868, 870–871.

Furthermore, Section 4.5.1 of the Project Manual provides:

"The contractor warrants to the Owner and the Architect that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects, and in conformance with the Contract Documents. All Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective * * *."

Section 5.3.1 of the Project Manual also imposed a duty upon Davis Construction to require all the subcontractors to agree to be bound by the same obligations that bound the general contractor:

"The Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these documents, assumes toward the Owner and the Architect. Said agreement shall preserve and protect the rights of the Owner and the Architect under the Contract documents with respect to the Work to be performed by the Subcontractor so that the subcontracting thereof will not prejudice such rights, and shall allow the Subcontractor, unless specifically provided otherwise in the Contractor/Subcontractor Agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by these documents, has against the Owner."

The Project Manual imposed responsibility on Davis Construction for the acts of its subcontractors. Giving these provisions their plain meaning and import, Davis Construction cannot deny responsibility to plaintiff for any negligent workmanship performed by Katz.

Given our rulings herein, it is not necessary at this juncture to fully address plaintiff's arguments that there was sufficient evidence presented upon which a reasonable jury could have found that Cedar House and Davis Construction committed acts of negligence, independent of the acts of the subcontractor Katz, or that their conduct came within the parameters of the "assumed duty" doctrine. The state of the record does not permit us to determine the merit of those arguments,[2] and we leave them to consideration below on remand.

 Plaintiff also asserts that Cedar House and Davis Construction are liable to it for breach of contract and breach of express or implied warranties to which the fifteen-year statute of limitations for written contracts (R.C. 2305.06) and the six-year statute of limitations for oral contracts (R.C. 2305.07) apply. The law recognizes that claims for breach of contract or express written warranties may co-exist independently of any tort claim for negligent workmanship. *Portale v. Berkshire Condominium Owners Assn.* (Oct. 13, 1994), Cuyahoga App. No. 66793, unreported, at 14–16, 1994 WL 568332; *Cleveland City*

---

**2.** *E.g.* we note that Cedar House and Davis Construction concede that they had prior knowledge back in 1980 and 1981 from the Evans engineering reports that Katz had used excessive soldering flux in its prior installation work. This apparently precipitated the leaks in sprinkler heads already installed in the project. From the record, we cannot determine what remedial measures, if any, Cedar House and Davis Construction took to assure that the future sprinkler installation work leading to the individual units would not be similarly affected.

*School Dist. Bd. of Edn. v. Dela Motte–Larson, Nassau & Assoc.* (Dec. 21, 1989), Cuyahoga App. No. 56275, unreported, at 8, 1989 WL 155155.

Plaintiff alleges that Cedar House breached its express warranties found in Section 26 of the Purchase Agreement entered into with the individual condominium buyers at the time of sale. Section 26 states in pertinent part as follows:

"Section 26. Limited Warranty

"The grantor [seller] shall furnish a two (2) year warranty covering the full cost of labor and materials for any repair or replacement of roof and structural components, and mechanical, electrical, plumbing, and common service elements serving the condominium property, occasioned or necessitated by defect in material or workmanship.

"(a) The two (2) year warranty shall commence for the condominium property submitted by the original declaration on the date the deed or other evidence of ownership is filed for record following the sale of the first ownership interest in the condominium property."

These warranties track the identical language required by R.C. 5311.25(E).

Cedar House's express two-year warranty commenced to run on January 8, 1981, the date the first ownership interest in the property was transferred of record. To the extent that replacement of the leaking sprinkler heads in 1980 failed to cure the latent defects in the system, there may have been a breach of the express written warranty to fix a condition "occasioned or necessitated by defect in material or workmanship." Plaintiff would have fifteen years within which to bring an action for such breach under R.C. 2305.06.

The situation is not unlike that in *Fairmount Richmond Condominium Assn. v. Multiplex, Inc.* (Jan. 24, 1985), Cuyahoga App. No. 48076, unreported, at 5, 1985 WL 7457, where we stated:

"Secondly, the evidence is overwhelming that the Partnership knew the roofs were leaking. It did not conceal the defects; in fact, the Partnership attempted to repair the roofs. The Partnership is still liable to the Association, however, not because it fraudulently concealed defects, but rather because it did not effectively repair the defects after being given a list of deficiencies prior to the transfer and after promising repairs. An ineffective repair is not a satisfactory repair which will preclude an action against the vendor. This assignment of error is thus overruled."

There was no written contract signed between Cedar House and Davis Construction. However, pursuant to the Project Manual, Davis Construction nevertheless made certain express warranties to Cedar House, the owner, as follows:

"4.5 WARRANTY

"4.5.1 The Contractor warrants to the Owner and the Architect that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects, and in conformance with the Contract Documents. All Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment."

Under Section 26 of the Purchase Agreement, Cedar House was obliged to assign all warranties exceeding two years to the purchasers of the units. That obligation was stated as follows:

"All warranties made to the Developer that exceed the time periods specified above with respect to any part of the Unit or Common Areas and Facilities (as that term is defined in the Declaration of Condominium Ownership for Point East Condominium), shall be assigned to the purchasers of Units."

This duty to assign was also compelled by R.C. 5311.25(E)(5).

Since there was no time limit specified in Davis Construction's warranty of good workmanship, the warranty was indefinite and exceeded Cedar House's two-year warranty. Therefore, plaintiff's argument has merit and the lower court improperly granted summary judgment for Davis Construction based on breach of express warranty. Plaintiff as assignee of Cedar House was entitled to the benefit of Davis Construction's express warranty which contained no time limits.

The Supreme Court in *Mitchem v. Johnson, supra,* held in paragraph one of the syllabus:

"Where a warranty is breached by the builder and vendor of a real-property structure, he is subject to liability for damages proximately caused by such breach, and the recovery of damages for such breach does not depend on his negligence. (Paragraph two of the syllabus of *United Pacific Ins. Co. v. Balcrank, Inc.* [ (1963) ], 175 Ohio St. 267, 25 O.O.2d 77, 193 N.E.2d 920, approved and followed.)"

As previously noted, the four-year negligence statute had not run when plaintiff filed its suit. Consequently, there is no bar to plaintiff's claim against Davis Construction for breach of implied warranty.

Assignment of Error I is sustained.

The second assignment of error states:

"II. The trial court erred in granting summary judgment to defendant Katz."

Katz relies on the argument the plaintiff's action is barred because "privity of contract is required in a negligence action brought by a subsequent owner against a subcontractor." *Lin v. Gatehouse Constr. Co.* (1992), 84 Ohio App.3d 96, 102, 616 N.E.2d 519, 523; *Vistein v. Keeney* (1990), 71 Ohio App.3d 92, 106, 593 N.E.2d 52, 61–62.

Plaintiff claims, however, that it was in privity with Katz as a third-party beneficiary by assignment from Cedar House (the "owner") of the subcontract between Katz and Davis Construction. Therefore, plaintiff reasons it can sue Katz for negligence and breach of express and implied warranty. As our previous ruling implies, plaintiff's negligence claim against Katz is not barred by reason of the four-year statute of limitations. See discussion *infra.*

Plaintiff argues that Katz breached an express warranty which was intended to benefit the owner of the condominium under the subcontract between Davis Construction and Katz. We find merit to this argument. The language plaintiff relies upon is contained in the purchase order from Davis Construction to Katz, which states as follows:

"The Following Conditions Form a Part of This Order

"You are to protect and save harmless both the owner and ourselves from all loss, costs, suits, and damages due to accidents of your workmen, also to other workmen and the public caused by the acts or inaction of your workmen while on the premises of the owner. You shall carry all legal insurance policies to insure such protection.

" * * *

"You are to assume as to your work, the same responsibility toward the owner as our general contract imposes upon us. This relationship and similarity of obligation shall also include terms of payment, cleaning up and disposal of waste material."

In construing these contract provisions, we are to give them their plain, ordinary meaning, in the context in which they appear. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of syllabus; *Rite Aid of Ohio v. Marc's Variety Store* (1994), 93 Ohio App.3d 407, 415, 638 N.E.2d 1056, 1061–1062. We are compelled to hold that the last section means that Katz had assumed "the same responsibilities toward the owner [Cedar House] as [the] general contract imposes upon [Davis Construction]." As previously noted, Section 4.5.1 of the Project Manual states that "[t]he Contractor warrants to Owner * * * that all Work will be of good quality, free from faults and defects * * *." Furthermore, this construction is derived from Section 5.3.1 of the Project Manual wherein the "Contractor shall require each

Subcontractor * * * to assume toward the Contractor all the obligations and responsibilities which the Contractor * * * assumes toward the Owner * * *."

The purchase order contract was entered into on November 21, 1978 when Cedar House was "the owner" of the complex and Davis Construction was the general contractor. However, in *Hill v. Sonitrol* (1988), 36 Ohio St.3d 36, 40, 521 N.E.2d 780, 784–785, the Ohio Supreme Court held as follows:

"If the promisee * * * intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary' who has no enforceable rights under the contract."

This court recognized in *Lin v. Gatehouse Construction Co., supra,* that a subsequent owner such as plaintiff could sue a subcontractor if it could prove it was in privity to the subcontract or an intended third-party beneficiary. In *Lin,* this court determined that the trial court had erred in dismissing plaintiff's third-party beneficiary claim because it did not have the contract before it:

"Those cases which have construed whether a contract was made for the direct or incidental benefit of a third party have looked necessarily to the language of the contract to make this determination. * * *

"In the present case, we are unable to conduct such a review, since we are unable to look beyond the pleadings. Construing all allegations and reasonable inferences drawn from them in favor of the owners, we cannot conclude they are intended or incidental beneficiaries to the contracts entered into between Gatehouse and the subcontractors. Therefore, the court erred in granting the subcontractor's motions on the basis of the third-party beneficiary theory." *Id.* at 100, 616 N.E.2d at 522.

In the case before us, the purchase order between Davis Construction and Katz clearly intended to benefit the third-party "owner" (Cedar House) by placing on Katz "the same responsibility toward the owner as our general contract imposes on us [Davis Construction]."

Cedar House, the original "owner," was specifically obliged to assign its rights in warranties to the condominium owners pursuant to Section 26 of the Sales–Purchase Agreement:

"All warranties made to the Developer that exceed the time periods specified above [the two year and one year warranties] with respect to any part of the Unit or Common Areas and Facilities (as that term is defined in the Declaration of

Condominium Ownership for Point East Condominium), shall be assigned to the purchasers of Units."

The express warranties to the owner made by Davis Construction in the Project Manual and assumed by Katz under the purchase order have no time limitations, and therefore, exceed the two-year and one-year warranties made by Cedar House to plaintiff. Katz itself acknowledged in its motion for summary judgment that "all of Cedar House's rights regarding common areas of the condominium were assigned to plaintiff, Point East Owners' Association." We find that plaintiff, as assignee of Cedar House, was in privity with Katz, as an intended third party beneficiary under the purchase order. Plaintiff was entitled to maintain actions in negligence and for breach of express and implied warranties against Katz. The symmetry and interlocking nature of the construction documents require this conclusion.

Katz also argues that "Ohio law bars tort claims for economic damages in the absence of privity of contract," citing *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206. Since we have previously held that there was privity of contract because plaintiff, as assignee of Cedar House, which was both the direct and third-party beneficiary of Katz's Purchase Order commitment, it is not necessary to address this argument.

Assignment of Error II is sustained.

Judgment reversed and remanded for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

JAMES D. SWEENEY, P.J., and O'DONNELL, J., concur.