DECISION AND JUDGMENT ENTRY
This is an appeal from several judgments entered by the Athens County Common Pleas Court on various claims brought by, or against, Connie D. Hendren, defendant below and appellant herein.[1] The following errors are assigned for our review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES, THE KARRS, ON THE COUNTERCLAIMS OF APPELLANT, CONNIE D. HENDREN IN THE FACE OF SUBSTANTIAL EVIDENCE SUPPORTING HENDREN'S CLAIMS AND THE EXISTENCE OF GENUINE ISSUES OF MATERIAL FACT PRECLUDING THE ENTRY OF SUMMARY JUDGMENT."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR APPELLEES, JLH (NOW KNOWN AS UNIVERSITY ESTATES, INC.) ON THE CROSS-CLAIMS OF APPELLANT, CONNIE D. HENDREN, IN THE FACE OF SUBSTANTIAL EVIDENCE SUPPORTING HENDREN'S CLAIM AND GIVEN THE FACT THAT (a) THERE ARE GENUINE ISSUES OF MATERIAL FACT PRECLUDING THE ENTRY OF SUMMARY JUDGMENT FOR APPELLEES, AND (b) APPELLANT HENDREN HAS A PROPERLY FILED MECHANIC'S LIEN ON THE PROPERTY IN QUESTION COVERING A MASSIVE AMOUNT OF WORK THAT MR. HENDREN PERFORMED TO DEVELOP A GOLF COURSE ON THE LAND IN QUESTION."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN PEREMPTORILY ISSUING A FINAL JUDGMENT ENTRY THAT COMPLETELY IGNORED BUT HAD THE EFFECT OF DISMISSING, WITHOUT ANY RULING, ANALYSIS OR DISCUSSION, CONNIE D. HENDREN'S CROSS-CLAIMS AGAINST JLH FOR BREACH OF CONTRACT, CONSTRUCTIVE TRUST, SPECIFIC ENFORCEMENT TO BE DEEDED THE PROPERTY IN QUESTION, AND TORTIOUS INTERFERENCE."
This case involves an extensive and confusing array of parties, all of whom were engaged in a complex venture to develop roughly 780 acres of land near Athens, Ohio, into a combination eighteen (18) hole "championship" level golf course, residential subdivision and "adult congregate living facility."[2] The project went awry during the construction of the golf course which, in turn, spawned this complex and convoluted litigation. A brief overview (relatively speaking) of both the development project and the proceedings below is as follows.
The so-called "Highpointe Committee" of the Athens Area Chamber of Commerce is described as an organization of local citizens and representatives from Ohio University who are interested in bringing "senior" housing to their local market. One of the committee's members/employees, Anne Teske, was attending a conference in San Antonio, Texas, in the early part of 1995 when she happened to make the acquaintance of Richard Conard, M.D. and his wife, Betty.[3] Mrs. Teske told the Conards about her group and its overall mission to develop area housing for the elderly. The Conards were intrigued by this discussion and traveled to Athens to meet with committee members. The couple ultimately submitted a development proposal which culminated in a December 8, 1995 contract whereby Just Like Home, Inc. (a Florida company formed by the Conards in 1987) agreed to buy approximately 780 acres from Horace Karr, Dorothy Karr and Karr Construction Company (hereinafter "the Karr parties"), plaintiffs below and appellees herein, for the sum of $1,250,000. This contract (hereinafter "the original purchase agreement") was premised on several conditions including, inter alia, the following:
 "Notwithstanding any provisions hereinabove set forth, it is now agreed that the obligation of the Buyer to close hereunder is subject to the completion by the Buyer of a feasibility study and analysis, which it shall immediately undertake at its sole cost and expense, and which study shall be completed within twelve (12) months following full execution of this Agreement. In the event that the Buyer shall from such study and investigation, in its sole discretion, and for any reason, determine that the project or development of this land is not feasible, it may terminate this Agreement and all obligations hereunder by written notice to the Sellers . . ."
Just Like Home, Inc. subsequently hired Richard Fratiane as regional vice president in its offices in Cincinnati, Ohio, to oversee the project in Athens as well as any other project that the company might decide to undertake in the midwest region. Mr. Fratiane then brought in a David Tipton and a Bill Woodward as potential developers. Mr. Tipton, in turn, contacted appellant, Connie Hendren, about constructing the golf course portion of the project.
On November 14, 1996, appellant (d/b/a "Pro Links") and J. Gary Smith[4], both designated as "contractors," entered into an agreement with Mr. Tipton (d/b/a "Tipton Interests, Inc.) and Just Like Home, Inc., both designated as "owners," to develop an eighteen (18) hole golf course at the Athens project.[5] Their agreement (hereinafter the "golf course development agreement") provided that the course would not encompass more than two hundred (200) acres, would be complete by Spring of 1998, would not be encumbered by liens and would be of "championship caliber" with "watered tees, greens and fairways." The future relations of these parties was also delineated in the agreement as follows:
 "The owner will escrow the deed to the golf course property until the golf course has sown the trees, greens, and fairways and at that time the property will be deeded [sic] to an LLC of which the owner will be a 25% shareholder and the contractor will be a 75% shareholder. Owner will receive 25% of cash flow before debt service and equity return.
 The owner agrees to form a separate LLC on said lots [the course design was to allow for a minimum of 200 lots for subdivision development] with a 90-10 ownership with owner being 90% and contractor being 10%. This LLC will acquire land per contract with Horace Karr.
* * *
 The owner agrees to allow the contractor to use a portion of the additional 9-hole course south of Armitage Road to establish a bent grass sod farm."
With a designer/developer for the golf course secured, Just Like Home, Inc. continued its feasibility study of the overall project. The Karr parties executed an amendment to the original purchase agreement on December 3, 1996, granting Dr. Conard and his company an additional four (4) months to determine whether the development was feasible for the local market. That same month, Mr. Karr and Dr. Conard met with appellant to review an initial layout for the eighteen (18) hole golf course. Mr. Karr and Dr. Conard apparently approved of the "preliminary" or "conceptual plan" that was proposed. Dr. Conard was under the impression, however, that appellant would then draft a "final plan/layout" of the golf course for their approval. No such plan was ever submitted.
Just Like Home, Inc. and Messrs. Tipton and Woodward were never able to reach a decision as to the project's feasibility or come to "an acceptable arrangement which would allow [them] to move forward . . . to develop the project." Nevertheless, all interested parties continued negotiating amongst themselves and eventually met in Athens on April 17, 1997 at which time they agreed to a new contractual arrangement.[6] The terms of this new contract (hereinafter the "amended purchase agreement") are somewhat vague and confusing but, apparently, Mr. Tipton was given first option to purchase the subject property contingent on his ability (using due diligence) to pre-sell fifty percent (50%) of the "82 congregate apartment units in the proposed Highpointe Retirement Center . . ." If he was unable to do so, the Karr parties[7] had the second option of cancelling the arrangement altogether upon payment of $75,000 to Just Like Home, Inc. and Dr. Conard.[8] If the Karr parties did not exercise their rights to cancel, Just Like Homes, Inc. and Dr. Conard had the third option "to resume the rights and obligations" under the original purchase agreement by acquiring the property for $200,000 cash and then delivering a "first purchase money mortgage" for the remainder (i.e. $1,050,000). The amended purchase agreement also set forth additional provisions as follows:
 "6. JUST LIKE HOME, Inc. and the Conards hereby release from all claims, demands, actions, causes of action, damages of whatever nature, both known and unknown, and any other form of loss whatsoever, [the Karr parties], David Tipton, Bill Woodward, TIPTON INTERESTS, Inc., [appellant and his wife], PRO-LINKS OF OHIO, Inc., the Highpointe Committee of Athens, Ohio, and all employees, associates, and persons who may, by reason of their association with the aforesaid persons and entities, be claimed to have some liability in this matter without naming them.
 7. [The Karr parties] David Tipton, Bill Woodward, TIPTON INTERESTS, Inc., [appellant and his wife], PRO-LINKS OF OHIO, Inc., and the Highpointe Board of Athens, Ohio, hereby release JUST LIKE HOME, Inc. and the Conards from all claims, demands, actions, causes of action, damages of whatever nature, both known and unknown, and any other form of loss whatsoever.
 8. [The Karr parties] will honor the arrangement with [appellant] to build the golf course on the terms outlined in the letter of November 14, 1996 which would eliminate any claim by [appellant and his wife] against TIPTON INTERESTS, Inc., JUST LIKE HOME, Inc. or Dr. Conard or Betty Conard." (Emphasis added.)
Although still unclear who would end up owning the subject property, or whether the development project would even get off the ground, appellant began construction of the golf course on May 23, 1997.[9] Three (3) separate companies, all of them owned and created by appellant, would end up being involved in this project. The first of these was "Pro Links of Kentucky, L.L.C.," (hereinafter "Pro Links of Ky.") which prepared the "layout" of the course.[10] The second was "Tee to Green" which supervised the construction work pursuant to a contract with Pro Links of Ky. to build the course for the sum of $3,312,620.[11] The third company involved was "Pro Links of Ohio, L.L.C.," (hereinafter "Pro Links of Ohio") which was created to hold title to the property on which the golf course would be built.[12]
There was apparently never anything in writing to clearly delineate how construction of the golf course was to be financed. Appellant intended to fund the project first with his own money and then seek out "investors" in Pro Links of Ohio.[13] There were supposedly several investors lined up, each ready to commit more than a million dollars to the project, but these deals allegedly fell through when the golf course property was not transferred to the intended holding company (i.e. Pro Links of Ohio). Appellant nevertheless started construction and brought in numerous sub-contractors to clear, excavate and grade the land. He also purchased a substantial amount of materials with which to ultimately build the tees, fairways, etc. Having exhausted his own resources, appellant turned to Dr. Conard for assistance in continuing to fund the construction. Dr. Conard made a series of loans to appellant, or his various companies, totaling more than $130,000.[14]
All construction work stopped on the golf course in November of 1997.[15] The degree to which the course was completed depends on whom is being asked. Appellant contends that the course was lacking only an irrigation system, seeding of greens, "overseeing [of] the fairways" and construction of the clubhouse/pro-shop. Dr. Conard, on the other hand, was highly "doubtful that any of [appellant's] work [could] be incorporated into a playable golf course consistent with the original plans for the . . . project." A report prepared by M-E Civil Engineering Inc. would seem to bear out much of his concerns. The engineers, after reviewing the property, listed numerous problems with the site itself and with individual holes including two (2) holes that had actually been placed onto "adjacent landowners [sic] property."
In any event, during that same month (November) Mr. Tipton declined to exercise his option to buy the land pursuant to the amended purchase agreement. The Karr parties also declined their option to cancel the development thereby paving the way for Dr. Conard and Just Like Home, Inc. to come back into the picture and take over the project. In order to facilitate this, Just Like Home, Inc. incorporated a wholly owned subsidiary which it named JLH of Athens, Inc., n/k/a University Estates, Inc. (hereinafter "University Estates"), defendant below and appellee herein. Just Like Home, Inc. then assigned its rights under the April 17, 1997 agreement to the new company and arranged to transfer the stock it owned therein to Dr. Conard.
On December 12, 1997, the Karr parties executed warranty deeds conveying the subject properties to University Estates.[16] These deeds contained, inter alia, the following provisions:
 "Subject to all leases, easements, and rights of way of record and subject to real estate taxes for the year 1997 which will be prorated as of the date of this instrument, subject further to the Agreement between J. Gary Smith, Contractor, Connie Hendren, Contractor, Tipton Interests, Inc. and Just Like Home, Inc. dated November 14, 1995. The Grantees shall save the Grantors harmless from all claims and demands related to said Agreement except as to Tipton Interests, Inc."
University Estates, in turn, executed and delivered to the Karr parties its promissory note in the amount of $1,050,000 along with a purchase money mortgage in the premises to secure that debt. Several days before the closing, however, Pro Links of Ohio retained the services of a Larry Pugh to "remove all timber on the property."[17] The Karr parties were made aware of the timber cutting in January of 1998 and became concerned that it was damaging the value of their security. They contacted University Estates to discuss their concerns but were given an unsatisfactory response.
The Karr parties commenced the first case below (Case No. 98CI24) on January 26, 1998, alleging that University Estates, Pro Links of Ohio and Larry Pugh were committing waste to the property by timber cutting. They further alleged that such waste violated their rights as mortgagees thereby rendering the mortgage in default. The Karr parties asked that (1) the further timber cutting be enjoined, (2) the defendants be ordered to account for all proceeds from timber cutting and (3) the mortgage be declared in default and their interest(s) be foreclosed.
The second case below (Case No. 98CI99) was filed on March 20, 1998, by four (4) sub-contractors (hereinafter the "sub-contractors") who had worked on the project and were asserting mechanics' liens in the property as follows:
Sub-contractor/Amounts claimed Date notice of
 lien claimant as due and owing lien was filed Wesam Construction, $13,837.50 12-16-97 Inc.
 Roses' Excavating, $3,675.00 12-30-97 Inc.
 Mike Robinson, d/b/a $39,210.00 12-11-97 Robinson Excavation
 Carl March, d/b/a $18,566.39 12-15-97 Links Group
The parties named as defendants included appellant, University Estates, Pro Links of Ky., the Karr parties, and various other possible lien claimants including the Athens County Treasurer, Lester Jeffers, d/b/a Jeffers Construction, AllState Homes, Inc., Circle Hill Sand 
Gravel, Inc., and Cochran Transportation Services, Inc. The sub-contractors asked (1) that they be declared to have valid liens in the premises; (2) that those liens be foreclosed; and (3) that the property be sold with the proceeds therefrom applied to their respective claims.
On June 26, 1998, the trial court issued an order essentially consolidating these cases.[18] The first of many cross-claims was then filed by Circle Hill Sand Gravel (hereinafter "Circle Hill") and Cochran Transportation (hereinafter "Cochran") (Case No. 98CI99) asserting their own mechanics' lien in the premises and asking that such interest be foreclosed.[19] The Treasurer of Athens County filed cross-claims in both cases asserting liens for back real estate taxes and seeking judgment thereon in the amount of "$0.00."
The Karr parties ultimately filed additional claims in both cases against University Estates asserting that University Estates had "the obligation to defend" them against appellant's claims because it had purchased the property subject to existing contractual obligations with appellant. University Estates then filed cross-claims in both cases charging that, as a result of all the liens and other encumbrances being asserted in the land during the course of the present litigation, the Karr parties had breached the warranty covenants of good title that were set out in the deeds transferring the subject property. University Estates also filed a cross-claim against appellant on August 10, 1998 (Case No. 98CI24) asking for declaratory judgment as to their "rights and obligations" towards each other under both the golf course development agreement and the amended purchase agreement as well as damages for breach of those agreements and slander of title (as a result of appellant and his companies filing a mechanics' lien against the course).
Appellant, Pro Links of Ohio and Pro Links of Ky. filed two (2) separate cross-claims/counterclaims against the Karr parties and University Estates. The first of these was on June 26, 1998, in Case No. 98CI99, and was based on the golf course development agreement and on the amended purchase agreement.[20] Appellant alleged that he had not been "compensated in accordance" with those contracts for building the course. He and his companies also relied on a March 5, 1998 mechanics' lien that they had filed against the property claiming that $2,116,768 was due them for the work that had been performed at the site thus far. Appellant asked that the terms of the two (2)agreements be specifically enforced and that he and his companies be awarded damages for the amount set forth in the mechanics' lien.
Their second cross-claim/counterclaim was filed on July 13, 1998, in Case No. 98CI24. This pleading, which spans no less than thirteen (13) pages and contains no fewer than forty-six (46) paragraphs of averments, is somewhat unclear as to the precise legal nature of the causes of action asserted therein. It nevertheless appears that appellant and his companies pled claims in breach of contract (Counts I II), constructive trust (Count III), fraudulent inducement (Count IV), foreclosure of the mechanics' lien (Count V) and tortious interference with business relations (Count VI).[21] They demanded judgment ordering specific performance of the golf course development agreement as well as unspecified amounts of compensatory and punitive damages for breach of contract.[22]
On August 24, 1998, the Karr parties filed their "motion to dismiss and for summary judgment" on the claims brought against them by appellant, Pro Links of Ky. and Pro Links of Ohio. The Karr parties asserted that the basis for these particular claims had been an alleged breach of the golf course development agreement as a result of their not transferring the property to Pro Links of Ohio as called for in that contract. However, the Karr parties continued, preparation by appellant of a metes and bounds legal description for the property to be transferred was a necessary prerequisite before the conveyance could take place. They then cited a transcript of a hearing (incorporated into an affidavit by Mr. Karr) wherein appellant's attorney was said to have admitted that a legal description was never prepared. The Karr parties thus concluded that appellant had not satisfied a condition precedent to transfer of the golf course and that his claims (and those of his companies) for breach of contract must fail.
On September 21, 1998, University Estates moved for judgment on the pleadings as to the cross-claims filed against it by Circle Hill and Cochran as well as the mechanics' lien interest that had been asserted against it by Roses' Excavating, Inc. The basis for the motion was that these lien claimants had allegedly not filed their supporting affidavits within the statutory time frame thereby failing to perfect their would-be interest(s). University Estates thus concluded that the liens were invalid and that it was entitled to judgment in its favor as a matter of law.
Appellant, Pro Links of Ky. and Pro Links of Ohio filed a motion for partial summary judgment on September 30, 1998 as to the issue of liability in their claims against the Karr parties. The basis for their motion was that they had already satisfied their contractual obligations under the golf course development agreement by "designing the layout of the course, clearing the necessary land, building the tees and greens, and sowing the course, effectively making `payments' toward the `purchase price' of the property." This in turn, they argued, obligated the Karr parties to escrow a deed for the golf course property and then to ultimately transfer ownership of that property to the designated holding company (i.e. Pro Links of Ohio). Furthermore, appellant argued that it was not his responsibility (or that of either of his companies) to prepare a metes and bounds legal description for such a deed as had previously been suggested. Because the Karr parties never escrowed the deed, appellant concluded, they were liable to him and his companies "for damages to be proven at trial."
The sub-contractors, together with Circle Hill and Cochran, all moved for summary judgment as to their respective mechanics' liens on December 2, 1998. In support of their motion, they relied on deposition testimony given by appellant wherein he admitted that the amounts sought by these claimants were, in fact, due and owing to them for work performed, or materials supplied, to the golf course. These parties therefore concluded that there were no genuine issues of material fact in this case and that they were entitled to judgment and foreclosure of their liens as a matter of law.
On November 19, 1998, University Estates moved for summary judgment on the claims brought against it by appellant, Pro Links of Ky. and Pro Links of Ohio. The first point addressed by this motion was the purported mechanics' lien filed by appellant and Pro Links of Ohio against the golf course property. University Estates argued that the golf course development agreement did not call for the course to be built in exchange for a sum of money. Rather, appellant was to receive an ownership interest in the limited liability company which would, in turn, own the course. It was argued that this sort of contractual arrangement did not lend itself to the type of debtor/creditor relationship which typically supports a mechanics' lien under R.C. chapter 1311.[23]
With respect to the other assorted claims of appellant and his companies, University Estates contended that neither it nor the Karr parties breached the original golf course development agreement. University Estates posited that after all parties signed off on the amended purchase agreement, it was impossible to transfer the property into escrow or to a limited liability company until it could be determined who (Mr. Tipton, the Karr parties or Just Like Home, Inc.) would own the land. Appellant was a party to this agreement and, in any event, began work on the course even though the property had not been "escrowed," thus manifesting some degree of assent to that arrangement. It was also argued that the failure to finish the course, unencumbered, was a material breach of contract which then excused University Estates from its duty to transfer ownership of the course to a limited liability company (presumably Pro Links of Ohio) as called for in the golf course development agreement.
The trial court ruled on these various motions in a series of judgments beginning with an entry on February 8, 1999, wherein the court granted summary judgment in favor of the Karr parties on the cross-claims asserted against them by appellant and his companies. In the same entry, the court also overruled the cross motion for summary judgment filed by appellant, Pro Links of Ky. and Pro Links of Ohio against the Karr parties. The trial court provided little in the way of insight into its decision, except to say that it found the evidentiary materials submitted by the Karr parties to "adequately answer all the issues that must be answered for purposes of summary judgment . . ."
The trial court entered a second judgment on April 23, 1999 and partially sustained the motion for summary judgment filed by University Estates against appellant, Pro Links of Ky. and Pro Links of Ohio. With respect to the mechanics lien filed against the golf course property, the court held that the lien could not be maintained under R.C. chapter 1311. The court reasoned that such lien must be based on a debtor/creditor relationship and that there was no debt per se in this case. Instead, the court pointed out that appellant agreed to take an indirect ownership interest in the golf course (and share of future profits) in lieu of a monetary payment to construct the course. This mode of renumeration was deemed an insufficient foundation upon which to base a mechanics' lien. Judgment was thus entered in favor of University Estates to that limited extent.[24]
The trial court entered another judgment on August 24, 1999, addressing several of the other pending motions. First, the court granted summary judgment to University Estates on the remainder of the claims brought against it by appellant and his two (2) companies. The court ruled that there was "no basis" for appellant's claims and that, even assuming that there was, his breach of the golf course development agreement resulted "in a bar" to those claims. It was further determined that Pro Links of Ohio had "no interest in the present case" and that Pro Links of Ky. could not maintain any further claim because its rights were all derivative from appellant whose claims were (as mentioned above) barred. The trial court then turned to the motion for summary judgment filed by the sub-contractors, Circle Hill and Cochran. It was noted that there was never any factual dispute as to the value of the services and materials provided by those claimants. The court thus found that they were entitled to judgment in their favor against appellant.[25]
An additional decision and judgment was entered on October 20, 1999 which addressed the motion for judgment on the pleadings filed by University Estates on the mechanics' liens asserted by Circle Hill, Cochran and Roses' Excavating, Inc. The trial court agreed that these liens had not been perfected in a timely manner pursuant to R.C. 1311.06. Those liens were, therefore, declared to be "ineffectual" as against the golf course property.
This ruling was then carried over into what was purported to be a "final judgment entry" filed on November 1, 1999. The trial court therein repeated its entry of judgment on the pleadings in favor of University Estates on the mechanics' liens of Circle Hill, Cochran and Roses' Excavating, Inc. By the same token, however, the court recognized that these were still valid debts and entered judgment in favor of those same claimants against appellant personally.[26] The trial court also found no genuine issues of material fact and that three (3) of the original sub-contractors were entitled to judgment in their favor against appellant as a matter of law: Wesam Construction, Inc. in the amount of $13,837.50 plus interest; Mike Robinson, d/b/a Robinson Excavation in the amount of $39,210.00 plus interest; and Carl March, d/b/a Links Group in the amount of $18,566.39 plus interest. The court noted that these claims were just recently assigned to University Estates and that University Estates had been substituted as a party in interest in place of the aforementioned sub-contractors.[27] Judgments for these amounts were, accordingly, entered in favor of University Estates. Finally, at its request, the declaratory judgment, breach of contract and slander of title claims brought by University Estates against appellant (and presumably against his two (2) companies) were dismissed with prejudice.
Circle Hill, Cochran and Roses' Excavating, Inc. filed a joint notice of appeal (App. Case No. 99CA55) to contest the trial court's judgment that their respective mechanics' liens were invalid. Appellant then filed his own notice of appeal (App. Case No. 99CA57) from the trial court's various judgments against him on February 8th, April 23rd and August 24th of 1999. This Court sua sponte entered judgment on December 23, 1999, consolidating both cases for purposes of appellate review. Subsequently, Circle Hill, Cochran and Roses' Excavating, Inc. moved to dismiss their appeal. We filed an entry on April 17, 2000, granting that motion and ordering the case to "proceed solely on the appeal filed in Case No. 99 CA 57 by Connie Hendren."
On December 4, 2000, we dismissed that appeal for lack of jurisdiction. See Karr v. JLH of Athens, Inc. (Dec. 4, 2000), Athens App. No. 99CA57, unreported (hereinafter referred to as "Karr I"). It came to our attention, while reviewing the unwieldy and voluminous record in the cause sub judice, that the following claims had never been expressly resolved and were still technically pending:
 (1) The cross-claims asserted by the Athens County Treasurer for back real estate taxes.
 (2) The cross-claim asserted by appellant, Pro Links of Ky. and Pro Links of Ohio against AllState Homes, Inc.
 (3) The August 12, 1998, claim by the Karr parties against University Estates asserting that University Estates had a legal obligation to defend them against the claims brought by appellant, Pro Links of ky. and Pro Links of Ohio.
 (4) The September 11, 1998, cross-claim/counterclaim asserted by University Estates against the Karr parties for breach of warranty covenants of good title.
Moreover, the trial court had not made an express determination that there was "no just reason for delay" pursuant to Civ.R. 54(B). In the absence of such a determination, we held that the judgments were neither final nor appealable,[28] and we were consequently without jurisdiction to review them.[29]
After remand to the trial court, the court, on January 26, 2001, dismissed the Athens County Treasurer's cross-claims as well as the Pro Links of Ky. and Pro Links of Ohio cross-claims against AllState Homes, Inc. On February 2, 2001, an agreed judgment was filed whereby the Karr parties and University Estates dismissed the remaining pending claims against each other. This appeal followed.
 I
Before we address the merits of the assignments of error, we first note a procedural problem which has complicated our review of this difficult case. Appellant assigns three errors for our review. However, the "argument" portion of his brief contains eleven sub-parts of which only one appears to directly relate to any of those assignments of error. The provisions of App.R. 16(A)(7) require an appellant's brief to contain "[a]n argument . . . with respect to each assignment of error." The argument portion of the brief must be subdivided according to the assignments of error. Whiteside, Ohio Appellate Practice (1999 Ed.)94, § T5.17. Failure to organize the argument according to the assignments of error can be confusing and may result in the court of appeals overruling an assignment of error solely on the ground that it was not separately argued in the brief. Id. at 94-95.
It appears that sub-part XI of appellant's argument goes to his third assignment of error. It is much less clear, however, which of the other sub-parts relate to the other two assignments of error. We would be well within our authority, given this confusion with the brief, to simply overrule the assignments of error. However, in the interests of justice we will address them to the extent we can glean a pertinent argument from the other portions of appellant's brief.
 II
Appellant's first assignment of error asserts that the trial court erred by entering summary judgment for the Karr parties on the claims that appellant and his two companies brought against them. Our analysis of this argument begins from the premise that we review summary judgmentsde novo. See Broadnax v. Greene Credit Service (1997), 118 Ohio App.3d 881,887, 694 N.E.2d 167, 171; Coventry Twp. v. Ecker (1995),101 Ohio App.3d 38, 41, 654 N.E.2d 1327, 1329; Maust v. Bank OneColumbus, N.A. (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765, 768. Thus, we afford no deference to the trial court's decision, see Hicks v.Leffler (1997), 119 Ohio App.3d 424, 427, 695 N.E.2d 777, 779; Dillon v.Med. Ctr. Hosp.(1993), 98 Ohio App.3d 510, 514-515, 648 N.E.2d 1375,1378; Morehead v. Conley (1991), 75 Ohio App.3d 409, 411-412,599 N.E.2d 786, 788, and we conduct an independent review to determine if summary judgment was appropriate. Woods v. Dutta (1997),119 Ohio App.3d 228, 233-234, 695 N.E.2d 18, 21; Phillips v. Rayburn
(1996), 113 Ohio App.3d 374, 377, 680 N.E.2d 1279, 1281; McGee v.Goodyear Atomic Corp. (1995), 103 Ohio App.3d 236, 241, 659 N.E.2d 317,320.
Summary judgment under Civ.R. 56(C) is appropriate when the movants are able to demonstrate that (1) there are no genuine issues of material fact, (2) they are entitled to judgment in their favor as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party. The nonmoving party is entitled to have the evidence construed most strongly in its favor.Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370,696 N.E.2d 201, 204; Mootispaw v. Eckstein (1996), 76 Ohio St.3d 383,385, 667 N.E.2d 1197, 1199; Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46, 47-48. The party moving for summary judgment bears the initial burden to demonstrate that no genuine issue of material fact exist and that they are entitled to judgment in their favor as a matter of law. See Vahila v. Hall (1997),77 Ohio St.3d 421, 429, 674 N.E.2d 1164, 1170; Dresher v. Burt (1996),75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274; Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801. Once that burden is met, the onus shifts to the non-moving party to provide evidentiary materials in rebuttal. See Trout v. Parker (1991), 72 Ohio App.3d 720, 723,595 N.E.2d 1015, 1017; Campco Distributors, Inc. v. Fries (1987),42 Ohio App.3d 200, 201, 537 N.E.2d 661, 662-663; Whiteleather v.Yosowitz (1983), 10 Ohio App.3d 272, 275, 461 N.E.2d 1331, 1335-1336. With this in mind, we turn our attention to the case sub judice.
Appellant and his two companies filed a wide assortment of claims against the Karr parties and University Estates on June 26th and July 13th of 1998. The Karr parties moved for summary judgment and, on February 8, 1999, the trial court granted their motion insofar as the claims pertinent to them. Appellant argues that this constituted error. Specifically, appellant "appeals the dismissal of his counterclaims against the Karrs, which included causes of action for breach of contract (Counts I and II), constructive trust (Count III), unjust enrichment (Count V)[sic], judgment on lien (Count V), and tortious interference (Count VI)." We find no merit to any of these arguments.
It should be noted that the various "counts" cited in appellant's argument roughly coincide with those set forth in the July 13, 1998 counterclaim. We therefore presume that appellant is appealing the judgment on those claims and is not pursuing an appeal of the judgment entered on his June 26, 1998 counterclaim/cross-claim. That said, we note that several of the "counts" from that counterclaim applied only to University Estates and not to the Karr parties. The claim for constructive trust, count III, specifies, inter alia, the following:
 "Because [University Estates] took title to the property with knowledge of the Crossclaimants' rights to the golf course property and in the remainder of the property, a constructive trust has resulted by which [University Estates] is deemed to hold on behalf of the Crossclaimants the golf course property as well as a 10% interest in all lots developed on the property. [University Estates] has a duty to deed to [appellant], or to Pro Links of Ohio, the golf course property and to provide to [appellant] a 10% interest in the lots to be developed on the residential portion of the property." (Emphasis added).
This claim has no bearing on the Karr parties. The same is true with respect to appellant's claim for judgment on his mechanic's lien. The Karr parties conveyed their interests in the subject properties to University Estates on December 12, 1997. Appellant did not file his purported mechanic's lien until March 5, 1998. At that point, the only party for which the lien had any effect was University Estates. Similarly, the tortious interference claim (Count VI of the counterclaim) alleges only that University Estates and/or Dr. Conard tortiously interfered with appellant's business and that University Estates and/or Dr. Conard are liable to appellant for damages. Again, this claim was not directed at the Karr parties.
Appellant also argues that the trial court erred by entering summary judgment against him and his companies on their claim for "unjust enrichment" as set forth in Count IV of the counterclaim. After thoroughly reviewing that particular count, however, we are not persuaded that it was, in fact, a claim for unjust enrichment. The allegations of that count specify, in pertinent part, as follows:
 "The Karrs have acted with malice and intent to cause harm to Crossclaimants by inducing them to spend monies in improvement of the real property with no intention of honoring the terms of their [a]greements and are liable to Crossclaimants for damages resulting from said conduct and for punitive damages in an amount not to exceed three (3) times the compensatory damages to be awarded at trial." (Emphasis added.)
Appellant's use of the phrase "inducing them" suggests that this is a fraudulent inducement claim. Our conclusion is buttressed by the fact that appellant also asked for punitive damages as part of his remedy for that claim. We are aware of no authority of law, and appellant cites us to none, in which punitive damages can be recovered as part of an unjust enrichment claim. Punitive damages can be recovered, however, in a tort claim. We thus conclude that this was a fraudulent inducement claim and not an unjust enrichment claim. In that appellant does not direct his arguments on appeal to this particular legal issue, we will not address it in our review. That brings us back to the breach of contract claims in counts I II.
The golf course development agreement called for Just Like Home, Inc. to (1) transfer the golf course property to "an LLC" of which that company would be a 25% shareholder and appellant (and/or his companies) would be a 75% shareholder and (2) form a "separate LLC" for development of 200 subdivision lots around the golf course. The parties modified their arrangement in the April 17, 1997 amended purchase agreement. As mentioned previously, the Karr parties were given a second option therein to cancel the sale of the property to Just Like Home, Inc. and to Dr. Conard. The Karr parties also agreed to honor the golf course development agreement between appellant and Just Like Home, Inc. However, on December 12, 1997 the Karr parties conveyed the properties to University Estates. Appellant argued in Counts I II of his counterclaim that conveying the land (including the golf course) to University Estates rather than to an LLC, constituted breach by the Karr parties of their contractual obligation to appellant and his companies.
The Karr parties argued on summary judgment that they could not have transferred the golf course to a proposed LLC because appellant had not provided to them a legal description of the property. Appellant argued that it was up to the Karr parties to secure the property's metes and bounds description. The trial court disagreed and found that the Karr parties had established that no genuine issues of material fact existed and that they were entitled to judgment on appellant's counterclaims. Appellant contends this was error. Again, we disagree.
To begin, it is not entirely clear that the Karr parties were obligated to perform under the golf course development agreement. That agreement was between appellant and Just Like Home, Inc. The Karr parties only agreed to honor that agreement as part of the amended purchase agreement, which also gave the parties the "second option" to cancel the sale of the properties to Just Like Home, Inc. and Dr. Conard. This second agreement is far from a model of clarity. It appears to us, however, that the Karr parties were only meant to assume the obligations of Just Like Home, Inc. in the event that they exercised their option, cancelled the sale of the properties and proceeded with the development themselves.[30]
This was not the case, however. Apparently the Karr parties declined their option and Just Like Home, Inc. continued with the project through its subsidiary, University Estates. Accordingly, the parties to whom appellant should have looked to for fulfillment of the golf course development agreement was University Estates and Dr. Conard rather than the Karr parties.
Assuming, however, that the Karr parties were obligated to fulfill the terms of the golf course development agreement, we still agree with the apparent conclusion of the trial court that they did not breach that agreement by failing to transfer the golf course or the lots to an LLC. The terms of the golf course development agreement can best be described as exceedingly vague. That agreement calls for appellant to "develop an 18-hole golf course not to exceed 200 acres." No other restrictions or guidelines are given. Further, the course was to be designed in such a way as to allow for "a minimum of 200 lots for subdivision development."
These terms gave appellant almost complete and unfettered discretion as to the layout and the design of the course. Clearly, appellant was obligated to derive a metes and bounds legal description of the course that he was designing. The provision of that description to the Karr parties, or to anyone else, so that a deed could be prepared, was an obvious condition precedent to transfer of the golf course property. A condition precedent is an occurrence that must take place before a contractual obligation becomes effective. See Troha v. Troha (1995),105 Ohio App.3d 327, 334, 663 N.E.2d 1319, 1323; also see Puzzitiello v.Metropolitan Sav. Bank (Nov. 13, 1997), Cuyahoga App. No. 71814, unreported; Hickman v. Murray (Mar. 22, 1996), Montgomery App. No. 15030, unreported. If a condition precedent is not met, a party is excused from performing the duty promised under the contract. Troha,supra at 334, 663 N.E.2d at 1323-1324; also see Rudd v. OnlineResources, Inc. (Jun. 18, 1999), Montgomery App. No. 17500, unreported. Appellant would thus have been required to furnish a metes and bounds legal description for his golf course design before the Karr parties would have been obligated to transfer the course and development lots to any limited liability companies.
The Karr parties' motion for summary judgment was supported by an affidavit from Horace Karr. That affidavit incorporated a portion of a transcript from a hearing on a temporary restraining order wherein appellant's attorney admitted that his client had not prepared a metes and bounds legal description for the course.
Further, the Karr parties filed a reply memorandum wherein Mr. Karr submitted a second affidavit attesting that appellant had never given to them a legal description for the proposed golf course. This sufficiently carried the Karr parties initial burden under Civ.R. 56(C) to show that the condition precedent to transfer of the property had not been established. The burden then shifted to appellant to provide materials in rebuttal.
Appellant filed an opposing memorandum which included his own affidavit. That affidavit asserted that he "contacted Canter Surveying Services and arranged with Mr. Canter to perform a survey of the golf course for the development of a metes and bounds description." However, appellant does not state that such a description was ever completed and given to the Karr parties. Instead, appellant attests that he "anticipated that the Karrs would pay the costs of the survey since it was their property that was being parceled and since they had the final word as to the exact dimensions of the 200 acres." The logical conclusion from a review of this material is that appellant did not have the metes and bounds description prepared because he did not want to pay for the work. This was insufficient to rebut the evidentiary materials of the Karr parties showing that the condition precedent had failed. We conclude that the trial court committed no error by entering summary judgment in the Karr parties' favor on appellant's counterclaims. For these reasons, we overrule appellant's first assignment of error.[31]
 III
Appellant's second assignment of error involves the April 23, 1999 decision which granted partial summary judgment to University Estates on appellant's cross-claim against that company for foreclosure of his purported mechanic's lien on the golf course property. The trial court held that before a mechanic's lien can attach to property, a valid debtor-creditor relationship must exist between the parties. In this case, the golf course development agreement called for appellant to be compensated for his work by receiving a 75% ownership interest in the LLC which was to own the golf course. The trial court concluded that in view of the fact that the relationship between the parties called for appellant to be compensated with an ownership interest rather than being paid his costs of construction plus profit, the parties did not stand in a typical debtor-creditor relationship and, thus, the lien was not valid. Appellant argues that this constituted error. Again, we disagree with appellant.
Ohio law provides that every person who performs work in the furtherance of an improvement to real property, by virtue of a contract with the owner, has a lien on the premises to secure payment for that work. R.C. 1311.02. The purpose of our mechanic's lien laws is to securepayment for improvements to real estate. See generally Baldwin's, Ohio Real Estate Law Practice (1993) 773, § 55.01; 2 McDermott's, Ohio Real Property Law Practice (4th Ed. 1990), 69, § 19-11A. Before a mechanic's lien can attach there must exist the relation of creditor and debtor; a debt must be created before there is a lien. See Choteau, Merle Sandford v. Thompson Campbell (1853), 2 Ohio St. 114, 124; MahoningPark Co. V. Warren Home Development Co. (1924), 109 Ohio St. 358, 365,142 N.E. 883, 885; also see Price Brothers Co. v. Walters (1951), 65 Ohio Law Abs. 443, 445, 115 N.E.2d 12, 15; Horning Lumber Co. v. Connor
(1931), 10 Ohio Law Abs. 200, 202. We agree with the trial court's cogent analysis that a typical debtor creditor relationship did not exist in the cause sub judice which could support the attachment of a mechanic's lien.
The term "debt" is defined in part as "[a] sum of money due by certain and express agreement." (Emphasis added.) Black's Law Dictionary (5th Ed. 1979) 363. The golf course development agreement did not call for payment of money in exchange for construction of the golf course. Instead, appellant was to receive a twenty-five percent (25%) ownership interest in the LLC which was to hold title to the property. This arrangement was more in the nature of a joint venture rather than a debtor/creditor relationship. The owners of the property were to contribute the land as their capital contribution, whereas appellant would contribute labor and development expertise in exchange for his ownership interest. Again, we agree with the trial court's conclusion that this sort of arrangement is not encompassed by the mechanic's lien statutes. Our conclusion is supported by the fact that mechanic's lien statutes create rights in derogation of the common law and should, therefore, be strictly construed as to the question of whether a lien attaches. See Crock Constr. Co. v. Stanley Miller Constr. Co. (1993),66 Ohio St.3d 588, 592, 613 N.E.2d 1027, 1030-1031; Manpower, Inc. v.Phillips (1962), 173 Ohio St. 45, 179 N.E.2d 922, at paragraph one of the syllabus; Robert V. Clapp Co. v. Fox (1931), 124 Ohio St. 331,178 N.E. 586, at paragraph one of the syllabus. Appellant cites to us no authority, and we have found none in our own research, in which a mechanic's lien has attached under these sorts of circumstances. Moreover, as set forth above, we believe this runs contrary to the historical interpretation of such laws as well as the spirit (if not the precise letter) of the statute. Accordingly, we overrule appellant's second assignment of error.
 IV
Appellant's third assignment of error goes to what the trial court designated as a "final judgment entry" on November 1, 1999. Appellant argues that, in purporting to resolve all matters in the case, the trial court's ruling "had the affect [sic] of dismissing all of the remaining cross-claims that [he] had asserted against [University Estates] without any consideration of, analysis of, or ruling on any of those claims." We disagree with appellant.
As previously noted in Karr I, the trial court addressed his other cross-claims in its August 24, 1999 decision and judgment entry. The court essentially found "no basis" for those claims and further opined that even if a basis did exist, appellant's own breach of the golf course development agreement barred those claims. Thus, the trial court did not ignore these claims or "tacitly sweep" them away in its purported final entry as appellant would have us believe. The court simply addressed them at an earlier time. For these reasons, we find that the third assignment of error is without merit and is accordingly overruled.
Having considered all assignments of error set forth in the brief, and finding merit in none of them, the judgment of the trial court is hereby affirmed.
JUDGMENT ENTRY
It is ordered that the judgment be affirmed. Appellees shall recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 ___________________________ Peter B. Abele, Presiding Judge
Harsha, J.: Concurs in Judgment Opinion.
Kline, J.: Concurs in Judgment Only.
[1] The facts set forth in this opinion have been repeated verbatim from our earlier Decision and Judgment Entry in which we dismissed the appeal for the lack of a final appealable order. See Karr v. JLH ofAthens, Inc. (Dec. 4, 2000), Athens App. No. 99CA57, unreported. The matter is once again before this court for review. We note that the parties agreed that "consideration of the instant appeal shall be based upon briefs and arguments submitted in connection with Case No. 99CA57."
[2] We acknowledge that varying descriptions appear in the record as to how much acreage is involved in this project. Our figure is taken from a mortgage which describes the property as 860.06 acres excepting therefrom 81.31 acres.
[3] Dr. Conard was a family practitioner until his retirement from the medical profession in 1980. Since then, he has been in the business of developing "retirement housing."
[4] It is unclear from the record what happened to J. Gary Smith. The only other mention of him in these proceedings appears to be in a memorandum filed by appellant wherein he was said to have "abandoned the project . . ."
[5] Of course, at the time this agreement was entered, the Karr parties were still the owners of the properties in question. Appellant nevertheless claims that Mr. Tipton and Just Like Home, Inc. misrepresented their ownership interests to him.
[6] Those present at this meeting included appellant and his wife, Dr. Conard, Mr. Tipton, Mr. Karr and representatives from the Highpointe Committee in Athens.
[7] The amended purchase agreement actually refers to only Mr. Karr. However, because Mrs. Karr and Karr Construction Co. were also parties to the original purchase agreement, we refer to the "Karr parties" here in order to remain consistent.
[8] The $75,000 payment was apparently to reimburse Just Like Home, Inc. for the cost of the feasibility study. Mr. Tipton was also obligated to make the same payment if he ended up exercising his option under the new contract.
[9] It would appear that the Karr parties had decided to build a golf course even if their new arrangement with Mr. Tipton and Just Like Homes, Inc. fell through and the property remained in their hands. Appellant contended that the Karr parties told him that "it was their intention to develop the subject property into the golf course centered residential and commercial development as planned . . ." irrespective of who wound up being the final owner(s) thereof. Thus, appellant began "performing work to clear the land, shape the golf course [and] form the tees and greens" before the ownership issues were ever settled.
[10] Appellant testified at a deposition below that he did the layout of the course himself. He further related that, while architects can be hired to do golf courses, he did not hire any here nor did he retain any draftsmen or engineers to provide assistance. Appellant also gave no indication that he had any formal education or background training in any of these areas.
[11] The contract between these two (2) entities is highly confusing as it consistently lists the "Pro Links Group" as the party who will be doing the construction rather than Tee to Green. Nevertheless, considering that these are appellant's own companies, and because he insisted at his deposition that Tee to Green was doing the construction, we will assume for purposes of our analysis that this was, in fact, the case.
[12] The golf course development agreement, as stated above, provided that appellant was to have a 75% ownership interest in this company and the owner/developer of the remainder of the property would have a 25% ownership interest.
[13] It is unclear from the record whether appellant intended to sell portions of his ownership interest in the company to these investors, or whether he intended to borrow the money and have the investors take back a mortgage on the property or hold his interest as collateral.
[14] The terms of these loans were apparently never committed to writing. Dr. Conard recalls that, in exchange for the funds, appellant was to give him another 25% ownership interest in Pro Links of Oh. Appellant disputes that account claiming Dr. Conard "began demanding" a "substantial interest" in all of his business and devised a scheme to siphon off "50% if every dollar [he] earned for the rest of [his] life." It does not appear to us, however, that appellant ever offered his own, alternative, explanation for the terms of their arrangement.
[15] It is unclear whether the work stoppage was seasonal in nature or whether appellant simply ran out of money. In any event, the following month sub-contractors and materialmen began filing their affidavits for mechanics liens against the property.
[16] This conveyance was actually to JLH of Athens, Inc. which did not change its name to University Estates until later in these proceedings. Nevertheless, in order to simplify the already dizzying complexity of these cases, we will treat University Estates as having been the actual party involved from the outset.
[17] The only evidence of this arrangement appears to be in the copy of minutes to a meeting held by Pro Links of Oh. on December 9, 1997, at which time Mr. Pugh's employment and the terms thereof (Mr. Pugh would retain 60% of timber proceeds and pay 40% of the proceeds to Pro Links of Oh.) are set forth. Although these minutes appear to be signed by Dr. Conard, as a director of the company, he subsequently denied signing the document and claimed that his signature thereon was a forgery. Dr. Conard further asserted that appellant was "basically stealing timber money and timber from [him] at [that] point."
[18] This is the point at which these proceedings become increasingly complex and it becomes exceedingly difficult to follow all the claims, counterclaims, cross-claims, responsive pleadings thereto and assorted motions. Thus, in order to better understand the unwieldy procedural posture of this case, we will henceforth only address the parties' claims, motions for dispositive orders and the court's various judgments on the merits. We disregard the responsive pleadings, affirmative defenses, motions, opposing memoranda, orders or other procedural issues below which were not dispositive of the merits of this case.
[19] Circle Hill claimed that it was owed $24,643.95 for sand, gravel, peat and hydrated soil supplied to the golf course and Cochran claimed that it was owed $1,927.46 for transporting those materials to the work site.
[20] Actually, appellant and Pro Links of Ky. filed a motion "for leave" to file such pleading instanter. It does not appear that such motion was ever ruled on. However, given that leave of court was not required to file this pleading in the first place, we will treat the motion as having been granted and the cross-claim as having been filedinstanter at the time of the motion.
[21] One of the bases for the breach of contract claims set forth by appellant, Pro Links of Ky. and Pro Links of Ohio in both the cross-claims was that the Karr parties and University Estates were obligated to transfer ownership of the golf course to a limited liability company of which appellant was to own 75% and University Estates was to own 25%. Given that such transfer had never taken place, cross-claimants concluded that those parties were in breach of the golf course development agreement.
[22] This second cross-claim was also directed at AllState Homes, Inc. However, no specific claim was made against that particular company beyond the sole allegation that it claimed a mortgage interest in the premises.
[23] University Estates also asserted that even if this sort of development agreement would support a mechanics' lien, the affidavit of such lien was not filed in a timely manner.
[24] This ruling effected a "dismissal of Count V of [appellant's] and Pro Links' cross-claim."
[25] This judgment went only to the liability of appellant for the debts owed the service providers and materialmen. No ruling was made with respect to the validity of the liens themselves against the golf course property. It should also be noted at this juncture that Pro Links of Ky. filed for federal bankruptcy protection on December 11, 1998. Although the trial court ruled that no stay would be necessary below, it also explained that it would enter no monetary judgment against that company either.
[26] Appellant was ordered to pay Circle Hill the sum of $24,642.95 plus interest, Cochran the sum of $1,927.46 plus interest and Roses' Excavating, Inc. the sum of $3,675.00 plus interest.
[27] University Estates had apparently paid the claims of these sub-contractors as well as a claim by Lester Jeffers, d/b/a Jeffers Construction, for $1,897.
[28] When applicable, Civ.R. 54(B) must be satisfied in order for a judgment to be deemed final and appealable. See Hitchings v. Weese
(1997), 77 Ohio St.3d 390, 391, 674 N.E.2d 688; State ex rel. Wright v.Ohio Adult Parole Auth. (1996), 75 Ohio St.3d 82, 85, 661 N.E.2d 728,731; Chef Italiano Corp. v. Kent State University (1989), 44 Ohio St.3d 86,541 N.E.2d 64, at the syllabus.
[29] Ohio appellate courts have jurisdiction to review final orders or judgments of inferior courts within their district. Section 3(B)(2), Article IV of the Ohio Constitution; R.C. 2501.02.
[30] The interpretation of written contracts is a matter of law for the court. See Alexander v. Buckeye Pipeline Co. (1978), 53 Ohio St.2d 241,374 N.E.2d 146, at paragraph one of the syllabus; also see Point EastCondominium Owners' Assn. v. Cedar House Assoc. (1995),104 Ohio App.3d 704, 712, 663 N.E.2d 343, 349; Yaroma v.Griffiths(1995), 104 Ohio App.3d 545, 552, 662 N.E.2d 867, 871. We therefore construe the amended purchase agreement in a manner which we believe best effectuates the intent of the parties.
[31] Having found a failure of the condition precedent to transfer of the golf course, we need not and do not address the issues "substantial performance" or "material breach" of the golf course development agreement. Even if appellant had substantially completed construction of the course, the property could not have been transferred to an LLC without a proper legal description to include in the instrument of conveyance.